**UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS**

**UNITED STATES**

**v.**

**Lieutenant Colonel STEVEN S. MORITA**
**United States Air Force**

**ACM 37838**

**10 January 2014**

**\_\_\_\_ M.J. \_\_\_\_**

Sentence adjudged 3 October 2010 by GCM convened at Travis Air Force Base, California. Military Judge: David S. Castro.

Approved Sentence: Dismissal, confinement for 12 months, and fine of $75,000; in the event the fine is not paid, to be confined for 12 months.

Appellate Counsel for the Appellant: Major Zaven T. Saroyan; Major Nathan A. White: and Matthew A. Siroka, Esquire.

Appellate Counsel for the United States: Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; Major Tyson D. Kindness; Major Rhea A. Lagano; Major Charles G. Warren; and Gerald R. Bruce, Esquire.

Before

HELGET, HECKER, and WEBER
Appellate Military Judges

OPINION OF THE COURT

This opinion is subject to editorial correction before final publication.

WEBER, Judge:

A panel of officer members convicted the appellant contrary to his pleas at a general court-martial of seven specifications of forgery, one specification of larceny of Government money, and one specification of forgery of signatures in connection with claims, in violation of Articles 123, 121, and 132, UCMJ, 10 U.S.C. §§ 923, 921, 932. The members sentenced the appellant to a dismissal, confinement for 12 months, a fine of

$75,000, and contingent confinement for an additional 12 months in the event the fine was not paid. The convening authority approved the sentence as adjudged.

The appellant raises three issues on appeal: (1) Whether all charges and specifications should be dismissed because the Government failed to prove that the appellant was subject to UCMJ jurisdiction during the charged time frame; (2) Whether the two forgery charges (Charge I and the Additional Charge) are multiplicious; and (3) Whether the military judge abused his discretion by allowing a major change to the larceny charge (Charge II) over defense objection. As a sub-issue to Issue 3, the appellant alleges that the evidence is legally and factually insufficient concerning the conviction of Charge II and its Specification. This Court ordered and considered oral argument on the first issue.

We find that the appellant was not subject to court-martial jurisdiction for some of the charged offenses, and that Charge I and the Additional Charge are multiplicious. We modify the findings accordingly and reassess the sentence.

*Background*

The appellant was a reserve Individual Mobilization Augmentee[1] (IMA) assigned to the Health Services Office, Western Region. His unit was responsible for providing support to the planning, design, and construction of medical facilities within its region west of the Mississippi River, to include Pacific Air Forces. Members of the unit were required to travel frequently as part of their duties, working with the staff at medical units to plan and develop construction projects. The appellant was an experienced member of this unit, as he had been assigned to the office as an active duty officer from 1998 to 2003, and had been assigned to the same unit as an IMA since his separation from active duty. The appellant was the only reservist assigned to the unit, and his supervisors were generally unaware of proper procedures for approving reserve orders or approving travel vouchers for reservists.

As an IMA, the appellant was required each fiscal year to perform 12 annual training days on active duty[2] and 24 paid inactive duty training[3] (IDT) periods.[4] In

---

[1] As part of the Air Force Selected Reserve, Individual Mobilization Augmentees (IMAs) are individuals who are assigned to an active component unit and train in order to provide continuity by back-filling for that unit's members who mobilize. Air Force Instruction (AFI) 36-2629, *Individual Reservist (IR) Management*, ¶ 1.1.2.1 (13 August 2012); Department of Defense Instruction 1215.06, *Uniform Reserve, Training, and Retirement Categories*, ¶ 6.1.4.1.2 (7 February 2007).

[2] In addition to receiving a prorated amount of monthly base pay for these 12 days of active duty, an IMA receives a prorated amount of the basic allowance for housing and subsistence authorized for reservists. An IMA receives one "point" (a unit of measurement used to track a member's compliance with participation requirements and to give credit for retirement purposes) for each day of active duty during annual training. AFI 36-2254, Vol. I, *Reserve Personnel Participation*, ¶¶ 2.1, 2.2 (26 May 2010). If the reservist lives outside the established commuting area of the duty location, he or she is reimbursed for the expenses incurred when traveling to and from the duty location for annual training, and receives military pay and allowances for that day. *Readiness Management Group Individual*

addition, he received authorization throughout the charged time frame to work 120 military personnel appropriation (MPA) "man-days"[5] on active duty per fiscal year, meaning the appellant was authorized to work a total of approximately 144 days per fiscal year. For each fiscal year, the appellant was approved for and received orders covering the MPA man-days in blocks of 120 consecutive days, and he was paid as if he performed military duty on those days. However, because the appellant's duties generally required more intermittent attention throughout the year, his supervisor allowed him to fulfill those 120 days throughout the year instead of on the actual dates for which he was approved and paid.

The appellant falsely assured his supervisor that documentation concerning his time in military status and his travel vouchers were electronically tracked through the Air Reserve Orders Writing System and that the appellant's supervisor would not be involved in the approval process for these documents. The appellant's supervisor accepted this explanation, and did not see any travel authorizations or vouchers from the appellant. The unit made some efforts to track the appellant's whereabouts and his fulfillment of his MPA requirements, but the appellant's experience and status as the only reservist in the office, along with his unit's unfamiliarity with reserve procedures and failure to exercise more vigilance, allowed the appellant to take advantage of the lack of oversight over his actions.

From approximately November 2005 to October 2008, the appellant repeatedly forged the signatures of his supervisors and several other officials to create authorizations for him to be placed on travel orders and to receive compensation for travel expenses. Eventually, the amount of his purported travel expenditures on certain trips and the locations of certain claimed trips caught the attention of his supervisor. The appellant's supervisor insisted that the appellant provide an accounting for his MPA days to ensure that he was actually working the number of days for which he had already been paid.

---

*Reserve Guide* (*Guide*), ¶ 6.1. Available at http://www.afrc.af.mil/shared/media/document/afd-080408-050.pdf. The IMA also receives one point for any days on which official travel pay is received. *Guide*, ¶¶ 3.15.1, 6.1.

[3] An inactive duty training (IDT) period is a four-hour block of training, duty or instruction and an IMA may work two such blocks in one day. *Guide*, ¶ 3.3. The IMA receives a prorated amount of monthly base pay and one point for each of these 24 IDTs. AFI 36-2254, Vol. I, ¶ 4.9. Even if the IMA lives outside the designated commuting area of the duty station, the IMA is not reimbursed for any expenses incurred during his travel to and from the inactive duty training period (IDT) duty location. *Guide*, ¶ 3.3. The IMA also receives no points or military pay and allowances for IDT travel days. AFI 36-2254, Vol. I, ¶¶ 2.5.5.7, 4.2.3.

[4] Each IMA is also credited with 15 "membership points" for each year the IMA remains in an active reserve status. *Id.* at ¶ 2.2. Furthermore, although not required to do so in order to have a satisfactory year, reservists can also perform up to a certain amount of non-paid IDTs, for which they only receive points (one point for each four-hour period). *Id.* at ¶ 4.2.

[5] Military personnel appropriation (MPA) "man-days" are used to bring reservists onto active duty on a temporary basis (generally less than 139 days per year) in order to support the short-term needs of the active force. AFI 36-2619, *Military Personnel Appropriation (MPA) Man-Day Program*, ¶ 1.1 (22 July 1994). During MPA tours, an IMA generally accrues points, military pay and allowances, and travel reimbursement in the same manner as described in footnote 2. *Id.* at ¶ 8; AFI 36-2254, Vol. I, ¶ 6.

The appellant produced a document that did not align with the travel he had claimed and for which he was reimbursed.

A lengthy investigation revealed the appellant forged signatures on the following documents:

- Department of Defense (DD) Form 1351: Travel voucher used to claim reimbursement for expenses such as lodging, airline tickets, rental cars, mileage, tolls, parking, per diem entitlement, and similar costs.

- DD Form 1610: Request and authorization for temporary duty travel of Department of Defense personnel. Used to request, review, approve, and account for official travel.

- Air Force (AF) Form 40A: Record of individual IDTs. Used to record a reserve member's IDT periods for payment and/or points for years of service credit, and determine the member's fulfillment of the requirements for retention in the Ready Reserve.

- AF Form 938: Request and authorization for active duty training/active duty tour. Used to request and authorize Air Force reservist tours of active duty as well as acting as a temporary duty travel order.

- AF Form 973: Request and authorization for change of administrative orders. Used to change orders previously issued.

- Memorandum for Record (MFR): Various MFRs authorizing exceptions to normal expense limitations, such as exceeding the maximum allowable lodging expense for a given location.

All told, the appellant was charged with forging 510 signatures or sets of initials on more than 100 documents. The vast majority of the forged documents related to travel orders creation and reimbursement, with a small minority of the alleged forgeries relating to the creation of active duty orders or documentation of IDTs allegedly performed. The Government also alleged that some amount of his travel reimbursement amounted to larceny, asserting that some trips for which he was reimbursed involved personal travel while other reimbursements involved excess expenses claimed in the course of apparently official travel.

Further facts relevant to each issue are laid out below.

ACM 37838

*Jurisdiction*

At the pretrial investigation under Article 32, UCMJ, 10 U.S.C. § 832, the investigating officer (IO) noted that jurisdiction was a potential issue that had not yet been satisfactorily resolved. Specifically concerning subject matter jurisdiction, the IO observed:

> At the hearing, the [appellant's] reserve orders activating him to active duty were not produced. I have no way of knowing that he committed the alleged offenses while under orders because no matrix of dates comparing his orders to the alleged forgeries and larcenies was presented. Even if the dates lined up, the [appellant] could have submitted/signed (allegedly forged)/presented the documents while not on orders. Likewise, there was no testimony that related, "I saw him commit this offense while under orders."

At trial, the defense moved to dismiss all charges and specifications due to lack of both personal and subject matter jurisdiction. In response to the personal jurisdiction aspect of the defense motion, the Government introduced documents demonstrating that the appellant was recalled to active duty throughout relevant pretrial and trial stages, and the military judge found personal jurisdiction existed over the appellant. The appellant does not challenge this finding on appeal.

Concerning subject matter jurisdiction, the defense noted the Government had not remedied the issue identified by the IO. The defense argued to the military judge that the Government had produced no evidence showing the appellant's status at the time of each alleged offense.

The Government responded by generally asserting that all of the appellant's misconduct took place pursuant to his role as a reserve officer and was carried out to claim military pay, allowances, and benefits. The Government asserted that "jurisdiction over reserve members is not wholly contingent upon looking at dates which may appear on orders calling reservists to (or releasing reservists from) active duty service." Rather, the Government argued, case law from this Court and our superior court establishes that "jurisdiction over reservists encompasses a variety of factors beyond merely looking at the dates which appear on orders calling reservists to active duty service." Therefore, the Government asserted that it was not required to detail the dates on which the appellant was subject to orders or how those dates on orders compared to the dates of the appellant's charged misconduct. The Government did attach to its motion response three Air Force Form 49s, each placing the appellant on MPA orders for 120-day periods during the charged time frame. However, it did not specify what days the appellant performed his annual training tours, IDTs, or any other reserve duty pursuant to active

duty orders. The Government also did not provide a chart or other aid comparing the dates of the appellant's orders and IDTs to the dates of the charged misconduct.

The military judge accepted the Government's argument that it was not necessary for the Government to prove the appellant committed the charged misconduct while on active duty orders or while performing IDTs. Instead, at the Government's urging, the military judge relied on an unpublished case from this Court, *United States v. Morse*, ACM 33566 (A.F. Ct. Crim. App. 4 October 2000) (unpub. op.), and held that the appellant's actions took place in his capacity as a reserve officer, thereby establishing subject matter jurisdiction based on this fact alone. He further found that subject matter jurisdiction was established pursuant to the four-part test outlined in Article 2(c), UCMJ, 10 U.S.C. § 802(c).

We review questions of jurisdiction de novo. *United States v. Kuemmerle*, 67 M.J. 141, 143 (C.A.A.F. 2009). Jurisdiction is an interlocutory issue, to be decided by the military judge, with the burden placed on the Government to prove jurisdiction by a preponderance of the evidence. *United States v. Oliver*, 57 M.J. 170, 172 (C.A.A.F. 2002). *See also* Rule for Courts-Martial (R.C.M.) 905(c)(2)(B).

It is well established that subject matter jurisdiction requires that the accused be subject to the UCMJ at the time of the alleged offenses. *United States v. Ali*, 71 M.J. 256, 261-62 (C.A.A.F. 2012) (citing *Solorio v. United States*, 483 U.S. 435 (1987)). In *Solorio*, the Supreme Court overruled its prior decision in *O'Callahan v. Parker*, 395 U.S. 258 (1969), and held that jurisdiction of a court-martial depends solely on whether the accused was a member of the armed forces at the time of the charged offense. *Solorio*, 483 U.S. at 435, 450-51.

Article 2(a)(1), UCMJ, generally defines persons subject to the code as those "[m]embers of a regular component of the armed forces, including . . . other persons lawfully called or ordered into, or duty in or for training in, the armed forces, from the dates when they are required by the terms of the call or order to obey it." In addition, "[m]embers of a reserve component while on inactive-duty training" are subject to the code. Article 2(a)(3), UCMJ. No other section of Article 2, UCMJ, explicitly covers reservists. As a result, for much of the UCMJ's history, courts have held to a bright-line rule for subject matter jurisdiction over reservists – "there is no jurisdiction over a reservist who commits an offense when not on active duty or inactive duty training." Major Tyler J. Harder, USA, *Moving Towards the Apex: Recent Developments in Military Jurisdiction*, ARMY LAW., April/May 2003, at 15.

In 2000, however, this Court suggested that subject matter jurisdiction did not rely solely on whether a reservist was on active duty orders or performing IDTs at the time of the offense. In *Morse*, a reservist colonel was convicted of attempted larceny and filing false travel vouchers in conjunction with active duty and IDTs performed in his reserve

role.  *Morse*, unpub. op. at 1.  On appeal, Colonel (Col) Morse contended he had signed several of his forms after he was released from active duty or IDTs, and therefore subject matter jurisdiction was lacking.  However, he had stipulated at trial that he was serving on active duty or IDTs when he signed all the forms in question, other evidence supported this stipulation, and the military judge had found jurisdiction over the offenses.  Therefore, this Court found that subject matter jurisdiction existed because Col Morse was either on active duty or performing IDTs when he signed the forms that formed the bases for the charges.  *Id.*  However, the Court then went a step further, adding:

> Finally, even if we were to ignore the overwhelming evidence of subject matter jurisdiction noted above, we would still find jurisdiction based upon the simple and undeniable fact that the appellant signed these forms in his official capacity as a reserve officer in the United States Air Force.  It was part of his duty incident to these reserve tours or training to complete these forms with truthful information and that duty was not complete until the forms were signed, regardless of whether or not he completed travel pursuant to his orders.  Therefore, it is immaterial if the appellant did not sign these forms until after completing his travel.  He did so in a duty status.

*Id.* at 6 (citation omitted).  One commentator noted this decision "stretched the boundaries" of jurisdiction over reservists.  Major Christopher T. Fredrikson, USA, *The Unsheathing of a Jurisdictional Sword:  The Application of Article 2(c) to Reservists*, ARMY LAW., July 2004, at 4.  Another remarked the *Morse* decision "stepped beyond the traditional parameters of [r]eserve jurisdiction" and marked "a significant departure from past decisions that viewed status at the time of the offense as *the* determining factor in deciding whether subject-matter jurisdiction exists."  Harder, *supra*, at 13 (emphasis in original).[6]

Three years later, our superior court expanded the scope of jurisdiction over reservists in a different setting and through a different analysis in *United States v. Phillips*, 58 M.J. 217 (C.A.A.F. 2003).  Lieutenant Colonel (Lt Col) Phillips was an Air Force reservist IMA who traveled from Pennsylvania to Wright-Patterson Air Force Base (AFB), Ohio, pursuant to orders to perform her annual training tour.  While in Government quarters at Wright-Patterson AFB the evening before her annual training tour was scheduled to begin, she consumed brownies she knew to contain marijuana.  She unsuccessfully challenged the court-martial's subject matter jurisdiction at trial and before this Court.  *Id.*

---

[6] Our superior court denied review of the *Morse* decision, perhaps because determining the propriety of this Court's willingness to find jurisdiction outside of periods when Colonel Morse was on orders or performing IDTs was not necessary to the disposition of the case.  *United States v. Morse*, 55 M.J. 473 (C.A.A.F. 2001).

Our superior court agreed that subject matter jurisdiction was present. Because Lt Col Phillips was not in active military status or performing IDTs on the day she ingested the marijuana, subject matter jurisdiction was not present under Article 2(a), UCMJ. Nonetheless, the Court held that subject matter jurisdiction was present under Article 2(c), UCMJ. *Id.* at 220. Where a reservist is "serving with" the armed forces, and the individual is in "active service" based on the four-part Article 2(c), UCMJ, criteria, subject matter jurisdiction may be present even when the reservist is not in military status as defined in Article 2(a), UCMJ. *Id.* The Court noted the question of whether the person is "serving with" the armed forces "is dependent upon a case-specific analysis of the facts and circumstances of the individual's particular relationship with the military." *Id.*

Conducting this case-specific analysis, the Court found that Lt Col Phillips was "serving with" the armed forces on the day she ingested marijuana, as established by the following uncontested facts: (1) Lt Col Phillips was a member of a reserve component of the armed forces on the day of her offense; (2) she was traveling to a military base under military orders, and was reimbursed by the military for her travel expenses; (3) the orders were issued for her to perform military duty; (4) she was assigned to, occupied, and committed the offense in military officers' quarters; (5) she received a retirement point for the travel day; and (6) she received military base pay and allowances for the travel day. *Id.* The Court then concluded Lt Col Phillips was "in active service" under the four-part test of Article 2(c), UCMJ, noting she received military pay and allowances for the day of her offense and that her travel to the base in preparation for her upcoming active duty orders constituted the performance of "military duty." *Id.* Under those circumstances, the Court found Lt Col Phillips subject to military jurisdiction on the day she travelled to her unit. *Id.*

This case presents facts far more complicated and unsettled than either *Morse* or *Phillips*. The parties disagree not only on the interpretation of the facts contained in the record of trial and the reach of *Morse* and *Phillips*, but also what documents this Court may consider in reaching its ruling. After ordering and considering supplemental briefs and oral arguments, this Court has narrowed the subject matter jurisdiction issue to six questions that must be answered to reach our ultimate conclusion:

(1) Should this Court grant the Government's motion on appeal to attach several documents that purport to demonstrate the appellant was in military status during some of the charged offenses?

(2) Considering evidence properly before this Court, was the appellant actually on active duty orders or performing IDTs when any of the charged offenses took place?

(3)     For any periods where the record reveals the appellant was in military status under Article 2(a), UCMJ, were the appellant's orders sufficiently "valid" to demonstrate that he was actually a person subject to the code?

(4)     For charged offenses that transpired when the appellant was not on active duty orders or performing IDTs, to what extent does *Phillips* indicate that the appellant was nonetheless "serving with" an armed force sufficient to trigger the four-part analysis under Article 2(c), UCMJ?

(5)     To the extent that subject matter jurisdiction is not found for some or all of the charged offenses based either on the appellant's military status or *Phillips*, should this Court nonetheless find subject matter jurisdiction existed under the position espoused in *Morse*?

(6)     What is the proper remedy to address the appellant's conviction for any actions that occurred when subject matter jurisdiction was not present?

We address each question in turn.  Ultimately, we conclude that the Government did not demonstrate subject matter jurisdiction over the majority of the actions for which the appellant was convicted.

(1) Should this Court grant the Government's motion to attach documents?

After receiving the parties' initial briefs in this case, this Court ordered the parties to address specific points on the subject matter jurisdiction issue.  Among other matters, we asked the parties to address whether the appellant's actions for which he was convicted took place while he was in military status under Article 2(a), UCMJ.  The Government filed a supplemental brief and contemporaneously moved to attach two sets of records not introduced at trial:  (1) AF Form 938s with a records custodian affidavit; and (2) an Air Force Reserve Repository printout with a records custodian affidavit.  These documents purportedly help demonstrate what days the appellant was actually in military status during the charged time frame.

This Court denied the Government's motion to attach the documents, finding that the Government had not sufficiently demonstrated the proffered documents were relevant on appeal.  The Government then moved us to reconsider our denial.  We did not act on the motion for reconsideration at that time, instead directing the parties the issue would be covered at oral argument.

Article 66, UCMJ, 10 U.S.C. § 866, provides the Courts of Criminal Appeals factfinding powers.  *See United States v. Cendejas*, 62 M.J. 334, 342 (C.A.A.F. 2006). Article 66(c), UCMJ, grants the Courts of Criminal Appeals the authority to "weigh the evidence, judge the credibility of the witnesses, and determine controverted questions of fact, recognizing that the trial court saw and heard the witnesses."  However, "Congress

intended a Court of Criminal Appeals to act as factfinder in an appellate-review capacity and not in the first instance as a trial court." *United States v. Ginn*, 47 M.J. 236, 242 (C.A.A.F. 1997), *cited in United States v. Hurn*, 55 M.J. 446, 449 (C.A.A.F. 2001). Our factfinding authority "is not unlimited in scope but is expressly couched in terms of a trial court's findings of guilty and its prior consideration of the evidence." *Id.* Our authority to make findings of fact is particularly limited where the evidence presented after trial is conflicting. *Id.* at 243. *Cf. United States v. Johnson*, 43 M.J. 192, 194 (C.A.A.F. 1995) (noting the difficulties with resolving issues on appeal based on post-trial competing affidavits).

In *Oliver*, the appellant was a Marine Corps reservist charged with fraud against the United States. He did not challenge the Government's jurisdiction over him at trial, and his trial defense counsel admitted in his opening statement that the appellant was on active duty and continued on active duty through trial. *Oliver*, 57 M.J. at 172. On appeal at the Navy-Marine Court of Criminal Appeals, Staff Sergeant Oliver challenged the jurisdiction of the court-martial. The Government opposed, filing a motion to attach Sergeant Oliver's medical records to demonstrate that he was continued on active duty in a medical hold status beyond the expiration of his active duty orders. The Court of Criminal Appeals granted the Government's motion and both the Court of Criminal Appeals and the Court of Appeals for the Armed Forces found that these records established that the court-martial possessed subject matter jurisdiction over the offense. *Id.* at 173.

Unlike *Oliver*, in the instant case the appellant challenged the jurisdiction of the court-martial *at trial*, and the burden was on the Government then to establish jurisdiction. On appeal, the Government has still not established why it could not have introduced these documents at trial, documents that would have been responsive to the appellant's motion challenging the court-martial's jurisdiction. Indeed, the documents the Government now seeks to attach are the very type of documents the Article 32, UCMJ, IO advised the Government to introduce. The defense directly placed subject matter jurisdiction at issue by challenging it prior to arraignment. Instead of building the record at trial as to the appellant's status during the charged time frame, the Government chose to wholly rely on its theory that jurisdiction was established by the nature of the appellant's actions as a reserve officer rather than his military status at the time of the charged misconduct.

We decline to consider the documents the Government proffers for the first time on appeal. Therefore, the Government's motion to reconsider this Court's earlier denial of its motion to attach documents is denied. The documents the Government now seeks to attach pertain to a matter squarely at the heart of the trial, whereas our ability to accept additional evidence on appeal is normally limited to collateral claims. *See Ginn*, 47 M.J. at 242 ("[A] conservative view of a service appellate court's factfinding power on collateral claims is entirely consistent with our repeated holdings that Article 66[,

UCMJ,] does not authorize a Court of Criminal Appeals to determine innocence on the basis of evidence not presented at trial."). It would be fundamentally unfair to allow the Government to introduce documents at this stage of the proceedings when the appellant has lost his opportunity to contest their veracity, cross-examine their proponents, or call witnesses in rebuttal. We also note the documents are not entirely self-explanatory, and the parties differ as to their interpretation. Therefore, it is not proper to allow their introduction without a witness who could testify as to their meaning, something that can only occur at trial. Under these facts, we decline the Government's invitation to belatedly build the record as to the appellant's status throughout the charged time frame.[7]

(2) <u>Was the appellant actually in military status at the time of the charged offenses?</u>

Our answer to the first question means we are limited to the record that existed at trial as to the appellant's status. We next determine whether this record shows the appellant was in military status during any portion of the charged time frame. We find sufficient evidence in the record of the appellant's military status for certain time periods.

In response to the defense's motion to dismiss at trial, the Government presented the military judge with three AF Form 49s, evidencing that the appellant was approved to perform MPA man-day tours for the following periods: (1) 14 November 2005-14 March 2006, (2) 1 December 2006-30 March 2007, and (3) 1 October 2007-28 January 2008. The appellant's supervisor testified the appellant was placed on one MPA tour per fiscal year and the supervisor had approved the requests for MPA tours. Based on this, we find sufficient proof that the appellant was subject to the UCMJ for his misconduct during the three time periods reflected in these MPA documents.

Apart from these three MPA active duty tours, however, the record is incomplete as to the appellant's status throughout the remainder of the charged time period. Most of the prosecution exhibits admitted into evidence as proof of the appellant's misconduct related to either DD Form 1610s (request and authorization for temporary duty travel of Department of Defense personnel) or DD Form 1351s (travel vouchers). Standing alone, these travel-oriented documents are insufficient to demonstrate the appellant was in any military status during the periods of travel stated on them. The Government called no witnesses to explain how these travel periods lined up with the appellant's IDTs, annual training, or other periods of military service. The evidence introduced indicates the appellant was permitted to file and be reimbursed for travel vouchers without any proof of his military status during these periods, and therefore it is entirely possible that he took

---

[7] We considered ordering a post-trial factfinding hearing into evidence of the appellant's military status under Article 2(a), UCMJ, 10 U.S.C. § 802(a), pursuant to *United States v. DuBay*, 37 C.M.R. 411 (C.M.A. 1967). However, we find that this approach is inappropriate in a case such as this. *DuBay* hearings are more properly ordered "for addressing a wide range of post-trial collateral issues," whereas this issue was raised at trial and fell squarely at the heart of the case. *United States v. Harvey*, 64 M.J. 13, 22 (C.A.A.F. 2006). *See also id.* (finding that post-trial delay is a relevant factor in declining to order a *DuBay* hearing).

trips at government expense while in a purely civilian capacity. Indeed, the Government's theory of the case was that the appellant did exactly that. Therefore, the DD Form 1610s and DD Form 1351s fail to establish that the appellant was in military status as defined in Article 2(a), UCMJ, during the periods of travel documented on them.

In addition, to the extent the appellant may have traveled in fulfillment of any military duties, it appears he could have been "making up" MPA days for which he was earlier approved and compensated. Under the "agreement" with his supervisor, the appellant was permitted to be credited and reimbursed for 120 consecutive MPA days early in each fiscal year, but was allowed to actually perform these days scattered throughout the fiscal year at times he selected on his own, without coordination. Even if the appellant's travel constituted performance of MPA days for which he was earlier credited and compensated, we find that he was in status under Article 2(a), UCMJ, only during the times where he actually was credited and compensated for MPA days, and not during the days he actually performed the "make up" duty. This reading is consistent with the language of Article 2(a), UCMJ, which concerns itself with the member's official status, not duties performed. We find it inappropriate to stretch subject matter jurisdiction to other times when the appellant was allegedly "making up" his MPA requirements, particularly where the record does not reveal when the appellant was fulfilling earlier requirements and when he was on purely personal quests. We therefore find that we are bound by official Air Force records in determining when the appellant was in military status, not an informal agreement between the appellant and his supervisor.[8]

Apart from the MPA records, the Government did not introduce any other record that demonstrated when the appellant performed annual training tours, other periods of active military service, or IDTs. In its effort to prove the appellant committed forgery, however, the Government introduced a limited number of documents that also contained evidence of the appellant's military status. These records demonstrate the appellant was in military status and thus subject to military jurisdiction during the following time periods:

- 10-12 September 2007: active duty for training
- 11-15 February 2008: IDTs
- 18-22 February 2008: IDTs
- 25-26 February 2008: IDTs
- 8-12 September 2008: IDTs
- 15-19 September 2008: IDTs
- 22-26 September 2008: IDTs

---

[8] We note as well that the Government's theory would subject a reservist in the appellant's situation to UCMJ jurisdiction twice for the same military tour – once when Air Force records reflect the member is in status and once when the appellant actually fulfills his or her military requirements. We reject such a broad reading of Article 2(a), UCMJ.

In total, the documents introduced in motions practice and at trial demonstrate that the appellant was in military status pursuant to Article 2(a), UCMJ, during the following periods: (1) 14 November 2005-14 March 2006, (2) 1 December 2006-30 March 2007, (3) 10-12 September 2007, (4) 1 October 2007-28 January 2008, (5) 11-15 February 2008, (6) 18-22 February 2008, (7) 25-26 February 2008, (8) 8-12 September 2008, (9) 15-19 September 2008, and (10) 22-26 September 2008.[9]

(3) Were the appellant's active duty orders and IDT paperwork sufficiently "valid" to confer jurisdiction?

Despite this evidence in the record that the appellant was in a military status under Article 2(a), UCMJ, for at least some of the charged time frame, the appellant asserts he was never subject to such jurisdiction because there is insufficient evidence he was ever *validly* in military status in the charged time frame. He argues he was charged with a number of forgeries (including some relating to his military status) and therefore it is entirely possible that he forged the signatures on all of the documents relating to his military status, making them invalid. He further asserts he was charged with forging documents to place himself on military orders in order to further his personal concerns and take unofficial travel and therefore any orders or documents appearing to demonstrate he was in military status were invalid, because he did not perform any military duty under these documents. We decline to adopt the appellant's position.

Article 2(a), UCMJ, conditions subject matter jurisdiction on the member's official status at the time of the offenses. It does not concern itself with how the member got into that status or whether he was doing official Government business pursuant to that status. Under the appellant's rationale, the military would be wholly without jurisdiction to prosecute a member who fraudulently obtains military orders through forgery, is compensated for those orders, and receives military credit under those orders, simply because of the fraudulent nature of the member's own actions.[10] We find this position to be overbroad and contrary to the appellant's purpose at the time he took these actions to have his record reflect he was in military status. *Cf. United States v. Meadows*, 13 M.J. 165, 168 n.4 (C.M.A. 1982) ("Although an accused cannot create court-martial jurisdiction by consent, under some circumstances his actions may have the effect of establishing or confirming court-martial jurisdiction."). We therefore hold that to the extent the Government presented evidence showing the appellant was in active military

_____

[9] The Government also charged the appellant with forging signatures on Air Force (AF) Form 938s (request and authorization for active duty training/active duty tour) on 10 April 2006 and 28 January 2008. The appellant was convicted of the specifications that contained these allegations without exceptions. However, the record of trial contains neither of these AF Form 938s, and the individuals whose signatures the appellant was alleged to have forged did not testify about these documents. We therefore find there is no evidence that the appellant performed active duty service pursuant to these two AF Form 938s.

[10] In addition, the Government did not demonstrate at trial that *all* of the appellant's travel or his documents creating his military status were fraudulent or purely for personal business.

status or performing IDTs, the Government had jurisdiction over offenses occurring during those time periods, pursuant to Article 2(a), UCMJ, even if some of these documents contained forgeries.[11]

(4) Does *Phillips* support a finding of jurisdiction?

Having found that the appellant was subject to Article 2(a), UCMJ, jurisdiction for offenses committed during certain periods within the charged time frame, we next consider whether the appellant was "serving with" an armed force during the time periods covering the remainder of his misconduct, thus triggering a test for jurisdiction under Article 2(c), UCMJ.  We find that *Phillips* does not support such a holding.

*Phillips* involved a very fact-specific case in which the reservist committed her offense on a military base, on a travel day authorized by military orders, and on a day for which she received military pay, travel allowances, and point credit toward her military retirement.  All the facts the Court found persuasive to establish jurisdiction in that case were also uncontested.  The instant case is significantly different.

First, the facts of this case are anything but clear.  Because of the Government's theory of jurisdiction at trial, its method of charging the larcenies, and the "agreement" for the appellant to perform his MPA days at scattered intervals apart from the dates in the MPA orders themselves, the record does not always clearly reveal distinct periods of military service and non-military service, as was the case in *Phillips*.  Also, whereas in *Phillips* the reservist was compensated for the day on which the offense was committed, here the Government did not demonstrate that the appellant received any compensation or retirement credit for days on which he merely initiated the issuance of or completed travel forms (apart from days where he was in proper Article 2(a), UCMJ, status).  Such acts are generally performed before or after a reservist has performed the military duty covered by that paperwork and thus, absent evidence to the contrary, would be completed without financial compensation.  There is no evidence the appellant used Government resources or facilities to effect these forgeries.  In short, only one of the six facts our superior court found persuasive in *Phillips* is present here:  the appellant was a member of a reserve component on the dates in question.  That factor alone is insufficient to trigger the Article 2(c), UCMJ, test for jurisdiction; otherwise, the floodgates of UCMJ jurisdiction would be opened for reservists for actions long considered outside the scope of court-martial jurisdiction.

We acknowledge the appellant's offenses were military-specific.  He used his experience as a reservist and his knowledge of military procedures to forge the signatures

---

[11] The appellant was not charged with forging any of the AF Form 49s that approved his MPA tours, and the appellant's supervisor agreed that the appellant was approved for MPA tours at points during the charged time frame, further demonstrating that his orders for these tours were sufficiently valid as to demonstrate subject matter jurisdiction for the time periods they covered.

of his military superiors and co-workers, submit these documents to military authorities, and thereby steal currency belonging to the military. This is not a situation where a reservist committed his misconduct in a purely civilian capacity with no connection to the military. Nonetheless, this case is also a far cry from *Phillips*.

The UCMJ's drafters and enactors were sensitive to concerns that Article 2, UCMJ, might overreach and bring reservists in their civilian status under the umbrella of UCMJ jurisdiction. They saw the requirement in Article 2(a), UCMJ, that the reservist be in military status at the time of the offense as sufficient protection against this concern.[12] Although *Phillips* further expanded jurisdiction concerning reservists to situations outside Article 2(a), UCMJ, our superior court was still sensitive to the concern that jurisdiction over reservists could be expanded too far. In fact, the *Phillips* Court specifically quoted from the Senate Report accompanying Article 2, UCMJ's amendment, noting that Article 2(c), UCMJ, is "not intended to affect reservists not performing active service or civilians." *Phillips*, 58 M.J. at 219 (quoting *S. Rep. No. 96-197*, at 122 (1979)). The Court then went on to determine that Lt Col Phillips was "in active service" at the time of her offense under that case's unique facts and thus fell within the bounds of Article 2(c), UCMJ. *Id.* at 220. The instant case presents a far different scenario where the appellant (for offenses that took place outside his periods of military service) was forging documents and collecting currency obtained through larceny when he was in no military status whatsoever. The mere fact the appellant's offenses were aimed at the military does not confer jurisdiction, and we do not believe our superior court intended to extend jurisdiction over reservists to any scenario where the reservist commits an offense against the military. In short, *Phillips* does not support extending jurisdiction under Article 2(c), UCMJ, to offenses committed when the appellant was not in military status, particularly where the record does not reveal when the appellant was performing military duties or making up earlier approved MPA days.[13]

---

[12] *See, e.g.*, *Uniform Code of Military Justice: Hearings on S. 857 and H.R. 4080 Before a Subcomm. of the S. Comm. On Armed Services*, 81st Cong. 154-55 (1949) (response of Felix Larkin, assistant general counsel to the Secretary of Defense, to concerns that Article 2(a)(3), UCMJ, might be interpreted to cover reservists when they merely wear a uniform or take a correspondence course, who stressed the article was intended to provide reservists with notice of when they were subject to the UCMJ through the requirement that they receive notice of their UCMJ jurisdiction before beginning IDTs.). *See also id.* at 329 (stressing that Article 2(a)(3), UCMJ, represented a significant diminution of jurisdiction from a prior statute involving Navy reservists); *Congressional Floor Debate on The Uniform Code of Military Justice*, 200 (1949-50) (statement of Senator Kefauver that Article 2(a)(3), UCMJ, was intended to limit jurisdiction over reservists on IDTs and provide notice to such reservists as to when they were subject to the code); *Conference Report to Accompany H.R. 4080*, 81st Cong., 2d sess., at 4-5 (report from Rep. Brooks of the conference committee expressing concern that the armed forces should not be given "wide latitude" to obtain UCMJ jurisdiction over reservists).

[13] *United States v. Phillips*, 58 M.J. 217 (C.A.A.F. 2003) also involved a reservist who had been called to active duty pursuant to orders to complete her annual active duty tour. Under Article 2(c), UCMJ, a person serving with an armed force and who meets the four-part Article 2(c), UCMJ, test remains subject to the code "until such person's active service has been terminated in accordance with law or regulations promulgated by the Secretary concerned." That Court could easily apply this jurisdictional limit in Lieutenant Colonel Phillips' situation, which involved one distinct period of active duty service. Here, there is no evidence the appellant was ever on active duty outside of the periods discussed above. Therefore, it would be illogical to hold that the appellant was subject to jurisdiction under

Finally, we note that even if the *Phillips* framework led us to find the appellant was "serving with" the armed forces for offenses that occurred when he was not in Article 2(a), UCMJ, status, subject matter jurisdiction would still not be present under these facts because he was not in "active service" based on the four-part test of Article 2(c), UCMJ. The third criterion under Article 2(c), UCMJ, requires the member to have received military pay or allowances during the period in question. For periods where the appellant was not in Article 2(a), UCMJ, status, there is no evidence the appellant received pay or allowances for his mere act of completing travel-related forms. As far as the record reflects, the appellant's actions outside periods of Article 2(a), UCMJ, jurisdiction came on days when he was not compensated for his act of completing travel forms. The fact that he later received travel compensation for his fraudulent activity does not alter the fact that he did not receive pay or allowances for any military service on the dates in question.

(5) Should this Court adopt the *Morse* position?

In motions practice at trial, the Government and the military judge primarily relied on this Court's statement in *Morse* that jurisdiction could be found apart from evidence of a reservist's military status, in a situation where a reservist signs forms in his "official capacity as a reserve officer in the United States Air Force." *Morse*, unpub. op. at 6. Under this approach, subject matter jurisdiction would attach over a reservist any time a reservist completes actions incident to his or her duty as a member of a reserve component. We disagree.

First, we note that *Morse*'s statement about subject matter jurisdiction under Article 2(c), UCMJ, constituted dicta, because our Court found ample evidence in the record to conclude that Col Morse was in a proper Article 2(a), UCMJ, status at the time of his offenses. Second, the dicta from this unpublished decision does not provide a basis to find subject matter jurisdiction in the instant case, because the Government did not demonstrate the appellant forged the signatures incident to any official military duties. Finally, the later *Phillips* decision by our superior court affects any potential broad applicability of the *Morse* dicta. *Phillips* may have broadened subject matter jurisdiction over reservists beyond the strict limits of Article 2(a), UCMJ, but the Court did so through a narrow ruling on the facts presented in that case and a strict reading of Article 2(c), UCMJ. Nothing in *Phillips* or the legislative history of Articles 2(a) or 2(c), UCMJ, supports *Morse*'s conclusion that a reservist should automatically be subject to military jurisdiction any time he or she commits an act merely related to his reserve duties.[14]

_____

Article 2(c), UCMJ, for individual fraudulent actions, where the appellant was not on active service during the periods in question and we would have no way of determining when that distinct period of jurisdiction would end.
[14] To date, no other military court has followed the logic found in this dicta.

To be clear, we do not hold that subject matter jurisdiction may never be present when a reservist completes reserve obligations outside of periods of Article 2(a), UCMJ, service. However, as discussed above, it would be too great a stretch to find jurisdiction under Article 2(c), UCMJ, in the instant case, where the Government simply did not demonstrate how the appellant's criminal actions corresponded to genuine reserve obligations and periods of military service.

(6) <u>What is the proper remedy?</u>

Having found the court-martial only had subject matter jurisdiction over the appellant for misconduct committed while he was in Article 2(a), UCMJ, status, we affirm only those offenses that occurred during periods when the record demonstrates the appellant was in Article 2(a), UCMJ, status: (1) 14 November 2005-14 March 2006, (2) 1 December 2006-30 March 2007, (3) 10-12 September 2007, (4) 1 October 2007-28 January 2008, (5) 11-15 February 2008, (6) 18-22 February 2008, (7) 25-26 February 2008, (8) 8-12 September 2008, (9) 15-19 September 2008, and (10) 22-26 September 2008.

For Charge I and its specifications, the Government charged individual forgeries under each specification. The charge sheet (after some line items were stricken before trial) listed 195 line items, with 510 individual forgeries alleged. The members convicted the appellant of the forgery charge and specifications without exceptions or substitutions. Of these 510 individual forgeries of which the appellant was convicted, 178 of them occurred during the periods when the record reveals the appellant was in status pursuant to Article 2(a), UCMJ. Furthermore, we note the Government introduced insufficient evidence as to several of the individual alleged forgeries within these periods by failing to ask the purported signer if the signature at issue was his or hers.[15] As a result, we find the appellant's convictions for the following forgeries legally and factually insufficient:

| Document Type | Purported Signer | Travel Order # | Date | Signatures/sets of initials |
|---|---|---|---|---|
| DD Form 1610 | ME | TV0105 | 9 Feb 07 | 2/2 |
| AF IMT 938 | KP | D28796 | 10 Sep 07 | 1/0 |
| DD Form 1610 | JM | TV0139 | 21 Oct 07 | 1/0 |
| DD Form 1610 | JM | TV0140 | 1 Nov 07 | 1/0 |
| DD Form 1610 | JM | TV0142 | 15 Nov 07 | 1/0 |
| MFR | KP | TV0140 | 19 Nov 07 | 1/0 |
| DD Form 1610 | JM | TV0141 | 20 Nov 07 | 1/0 |

---

[15] In some instances, the Government also neglected to introduce the document alleged to be forged in addition to not providing witness testimony about the alleged forgery.

| DD Form 1610 | JM | TV0144 | 12 Dec 07 | 1/0 |
|---|---|---|---|---|
| DD Form 1610 | BK | TV0143 | 20 Jan 08 | 2/2 |
| DD Form 1610 | JM | TV0144 | 20 Jan 08 | 1/0 |
| DD Form 1610 | JM | TV0143 | 20 Jan 08 | 1/0 |
| AF IMT 938 | KP | D05114 | 28 Jan 08 | 2/0 |

Eliminating these factually and legally insufficient alleged forgeries, the number of forgeries of which the appellant was properly convicted is further reduced to 159.[16]

The larceny in Charge II and its Specification represents a more difficult situation. On the initial charge sheet, the Government listed 65 individual travel payments in which the appellant was alleged to have stolen money from the Government. However, shortly before trial, the Government successfully moved to amend the Specification of Charge II to "give[] the [G]overnment more flexibility." The amended specification removed references to individual larcenies, instead alleging that the appellant stole money from the Government on divers occasions between on or about 1 January 2005 and on or about 1 March 2008, of a value of more than $500.00. As a result of this change,[17] the Government did not detail for the members exactly which trips were alleged to be larcenous, or even exactly what its theory of larceny was.[18] The members convicted the appellant of the amended specification without exceptions and substitutions.

After reviewing the record, we are unable to conclude exactly which travel payments the members determined were obtained through larceny. As a result, we cannot conclude if the members convicted the appellant of two or more larcenies during times when subject matter jurisdiction was present, especially in light of the Government's strategy at trial. The Government focused particular attention on demonstrating that a small number of the travel payments were obtained through larceny, and therefore the appellant's travel claims were not to be trusted in their entirety. Although some of the payments the Government focused on at trial did take place while the appellant was in Article 2(a), UCMJ, status, in each instance the Government relied largely on inference in an effort to prove the corresponding trip was for unofficial purposes. No witness was able to definitively state the appellant had no official reason to travel to any given location, or that any individual expenses were sufficiently exorbitant

---

[16] The appellant alleges there is insufficient proof he actually committed the forgeries on the dates listed next to each signature, and therefore there is no way of knowing when the forgeries were committed. We reject this contention. There is no reason to suspect the appellant had a motive to alter the dates on any forged documents, and the Government's burden to establish subject matter jurisdiction is only a preponderance of the evidence. We conclude the dates listed next to each forgery adequately establish the appellant committed the offenses on the dates listed.

[17] While the record makes it abundantly clear the Government and trial defense counsel understood the change and the military judge approved the change, the change was not reflected on the original charge sheet.

[18] The Government alternatively argued that the appellant claimed excess expenses on some trips (for example, rental car fuel in excess of that needed for the mileage involved), or that some of the trips were wholly or partially taken for personal business.

that they could not have been legitimately incurred.  Instead, the Government merely introduced the travel vouchers and then argued the vouchers on their face proved some amount of larceny based on factors such as the destinations of the trips, the appellant's travel patterns, and the nature of the expenses.[19]

Under the general verdict system the members were not required to state which instances they found constituted larceny, and we are unable to determine this in the record before us.  Therefore, we cannot determine whether the appellant was properly convicted of two or more larcenies that occurred only when subject matter jurisdiction was present.  We are left with no other appropriate remedy but to set aside the finding of guilty as to Charge II and its Specification.

We need not discuss a remedy for the Additional Charge and its Specification, because below we set aside this guilty finding and dismiss this charge on multiplicity grounds.  We discuss the impact of these actions on the appellant's sentence below.

*Multiplicity*

Charge I alleged the appellant forged the signatures of seven coworkers or supervisors, in violation of Article 123, UCMJ.  The Additional Charge alleged the appellant forged the signatures of four military officers for the purpose of obtaining the approval, allowance, and payment of claims against the United States, in violation of Article 132, UCMJ.

This Court reviews multiplicity issues de novo.  *United States v. Anderson*, 68 M.J. 378, 385 (C.A.A.F. 2010).  Multiplicity in violation of the Double Jeopardy Clause of the Constitution occurs when "'a court, contrary to the intent of Congress, imposes multiple convictions and punishments under different statutes for the same act or course of conduct.'"  *Id.* (quoting *United States v. Roderick*, 62 M.J. 425, 431 (C.A.A.F. 2006)) (emphasis omitted).  Accordingly, an accused may not be convicted and punished for two offenses where one is necessarily included in the other, absent congressional intent to permit separate punishments.  *See United States v. Teters*, 37 M.J. 370, 376 (C.M.A. 1993).  Where legislative intent is not expressed in the statute or its legislative history, "it can also be presumed or inferred based on the elements of the violated statutes and their relationship to each other.  *Id.* at 376-77.  The Supreme Court laid out a "separate elements test" for analyzing multiplicity issues:  "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one,

---

[19] In two instances, the Government introduced additional evidence that the trips were larcenous – a photograph of the appellant running the New York City marathon during one of his trips to New York, and photographs of him at a college football game during a trip to Chicago and Indiana.  However, even if this evidence would have convinced the members that these trips were larcenous, neither of these two trips occurred during the dates we have found the appellant was subject to UCMJ jurisdiction.

is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Accordingly, multiple convictions and punishments are permitted for a distinct act if the two charges each have at least one separate statutory element from each other.

Article 123, UCMJ, Forgery, contains the following elements:

(a) That the accused falsely made or altered a certain signature or writing;
(b) That the signature or writing was of a nature which would, if genuine, apparently impose a legal liability on another or change another's legal rights or liabilities to that person's prejudice; and
(c) That the false making or altering was with the intent to defraud.

*Manual for Courts-Martial, United States* (*MCM*), Part IV, ¶ 48.b.(1) (2008 ed.).

Article 132, UCMJ, Frauds against the United States, contains the following elements:

(a) That the accused forged or counterfeited the signature of a certain person on a certain writing or other paper; and
(b) That the act was for the purpose of obtaining the approval, allowance, or payment of a certain claim against the United States or an officer thereof.

*MCM*, Part IV, ¶ 58.b.(5).

The appellant asserts the two offenses present identical elements, as each offense essentially requires a false signing made with the intent to defraud the Government. The Government counters by asserting that the Additional Charge is aimed at criminalizing "a distinct legal harm" because forgery of the approving official's signature on a travel voucher would, if genuine, operate not only to the legal harm of the United States, but to the legal harm of the approving official as well. The Government asserts that a forged approving official's signature, if genuine, could subject the approving official to disciplinary action for failing to fulfill his or her duties to review the expenses claimed. Therefore, the Government asserts that because the forgeries could have a different victim than the Article 132, UCMJ, offenses, the two charges are not multiplicious. The Government also argues the offenses are distinct because under forgery, the act of forging a signature alone completes the crime. In contrast, for the Article 132, UCMJ, offense, there must be a forged signature in connection with a "claim," which is defined as a "demand for transfer" of money. *MCM*, Part IV, ¶ 58.c.(1)(a). To complete this offense, the Government argues, the appellant needed to not only forge signatures but also complete substantial other documentation.

After hearing argument on this motion, the military judge ruled the two offenses were not multiplicious for findings. He issued no findings of fact or conclusions of law on this issue, and offered no analysis to support his ruling. He did, however, merge specifications 6 and 7 of Charge I into the remaining specifications of Charge I, and he merged the Additional Charge into Charge I for sentencing, reducing the maximum possible sentence to confinement from 50 years to 35 years.

We find that the two offenses are multiplicious. All of the acts charged under Article 132, UCMJ, were also charged as forgeries under Article 123, UCMJ. The forgery charge does not require proof of an element that Article 132, UCMJ, charge does not. The first element of the Article 132, UCMJ, offense requires that the appellant have "forged" a signature. This element necessarily encompasses all three elements of the forgery charge, as it uses the identical term as the title of the Article 123, UCMJ, offense, and the explanation of the term "forged" for Article 132, UCMJ, in the Manual refers to the definition of forgery utilized in Article 123, UCMJ. The Article 132, UCMJ, offense then requires proof of a second element – that the act was for the purpose of obtaining the approval, allowance, or payment of a certain claim against the United States or an officer thereof. While this element may be distinct from the elements of forgery, the fact remains that forgery does not require proof of any element that the Article 132, UCMJ, offense does not, because the Article 132, UCMJ, offense specifically requires that the appellant have "forged" a document. Forgery is therefore a lesser included offense of this Article 132, UCMJ, offense, and by definition, the two offenses are multiplicious. *See United States v. Rhine*, 67 M.J. 646, 652 (A.F. Ct. Crim. App. 2009) ("Offenses are multiplicious if one is a lesser-included offense of the other.") (citing *United States v. Palagar*, 56 M.J. 294, 296 (C.A.A.F. 2002)).

We requested the Government to elect which conviction to retain. *See Palagar*, 56 M.J. at 296-97. The Government first requested this Court affirm so much of the conviction under Charge I as did not overlap with the conviction under the Additional Charge, thereby retaining convictions for both offenses. In the alternative, the Government requested that if this Court should find that the two entire charges are completely multiplicious, then Charge I and its specifications should be retained. We find that the more prudent course is to set aside and dismiss the Additional Charge and its Specification. *See id.* (recognizing that an appellant court may elect on its own which charges and specifications to retain in the interests of justice and judicial economy). The Government elected to charge the appellant in a way so that the Additional Charge was wholly subsumed within Charge I. In addition, the military judge merged the Additional Charge into Charge I for sentencing purposes, indicating the more appropriate approach in this case is to simply retain Charge I and its specifications. We therefore set aside and dismiss the Additional Charge and its Specification.

*Change to Charge II/Legal and Factual Insufficiency*

At trial and on appeal, the appellant alleged that the military judge erred by permitting the Government to amend the Specification of Charge II after arraignment. The appellant argues that in amending the specification from listing specific instances of alleged larceny to a general divers occasions specification, the Government made a "major change" to the charge sheet after arraignment, an act not permitted over the accused's objection. R.C.M. 603(d). As a sub-issue to his claim of an improper major change, he alleges that his conviction on Charge II and its Specification is legally and factually insufficient, because the Government relied on a flawed theory that the appellant's fraudulent activity rendered all his travel reimbursements larcenous. As we have set aside this finding of guilty and dismissed this charge and specification, this issue and its sub-issue have been rendered moot and warrant no further discussion.

*Sentence Reassessment*

We have considered the possibility of returning this case for a sentence rehearing. However, we are confident that we can accurately reassess the appellant's sentence, despite the fact that the findings have been significantly altered and the fact that this case involved members.

This Court has "broad discretion" in deciding to reassess a sentence to cure error and in arriving at the reassessed sentence. *United States v. Winckelmann*, ___ M.J. ___ No. 11-0280/AR, slip. op. at 3 (C.A.A.F. 18 December 2013). Our superior court has recently observed that judges of the Courts of Criminal Appeals can modify sentences "'more expeditiously, more intelligently, and more fairly' than a new court-martial." *Id.* at 11-12 (quoting *Jackson v. Taylor*, 353 U.S. 569, 580 (1957)). Based on the totality of the circumstances in this case, we find that we may reassess the sentence, thereby curing any prejudicial effect of the errors in this case with regard to the sentence.

Despite the jurisdictional and multiplicity issues discussed above, the appellant still stands properly convicted of 159 instances of forgery involving five different people over an extended period. The larceny charge, the majority of the forgery line items, and the forgery in connection with claims charge no longer remain, but "the nature of the remaining offenses capture[s] the gravamen of criminal conduct included within the original offenses." *Id.* at 13. The gravamen of his offenses was that he carried out a long-term scheme to forge documents that allowed him to travel at Government expense. The remaining 159 line items in the forgery charge capture the essence of the original charged offenses. In addition, evidence of all the instances of forgery could have been introduced to the members in sentencing as evidence of a continuing course of conduct involving similar actions and misconduct with the same victim. *United States v. Nourse*, 55 M.J. 229, 231-32 (C.A.A.F. 2001). Our action on the jurisdictional issue reduces the maximum sentence to confinement from 35 years to 20 years, while our action on the

multiplicity issue does not affect the penalty landscape, because the military judge merged this charge with Charge I for sentencing. Thus, the appellant remained exposed to 20 years' confinement, while he was only sentenced to confinement for 12 months. Therefore, the penalty landscape has not changed so greatly that we are not able to determine what the members would have adjudged. The remaining offenses are also the sort that this Court has experience and familiarity with to reliably determine what sentence would have been imposed at trial by the members.

Therefore, under the unique facts of this case and considering the totality of the circumstances before us, we find that we are able to "determine to [our] satisfaction that, absent any error, the sentence adjudged would have been of at least a certain severity." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). It is inconceivable that members faced with an appellant who had committed 159 acts of forgery – largely on travel vouchers for which he was reimbursed – would not have imposed a sentence of a dismissal and at least three months of confinement. We therefore reassess the sentence accordingly.

*Post-Trial Delay*

This case was docketed with this Court on 10 February 2011, meaning nearly three years have passed before we rendered our decision. The appellant has not raised an issue concerning the post-trial delay in this case. Nonetheless, the appellate delay in this case far exceeds the standards set forth in *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006). It is this Court's practice to address issues of post-trial delay even when the parties have not raised the issue. It is therefore appropriate to consider whether the post-trial delay in this case warrants relief either on due process grounds or based on our authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c) to only approve so much of the sentence as we determine should be approved.

We review de novo claims that an appellant was denied his due process right to a speedy post-trial review and appeal. *Moreno*, 63 M.J. at 142. In conducting this review, we assess the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): (1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice. *Id*. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *United States v. Toohey*, 60 M.J. 100, 102 (C.A.A.F. 2004)). There is a presumption of unreasonable appellate delay when the Court of Criminal Appeals does not render a decision within 18 months of docketing. *Id*. at 142.

In this case, the appellate delay was facially unreasonable, and we therefore proceed to an analysis under the *Barker*/*Moreno* factors.

(1) The length of the delay

The appellant's case was docketed with this Court nearly three years ago. The appellate processing in this case is nearly double the period that *Moreno* identified as presumptively unreasonable. This factor weighs in favor of the appellant.

(2) The reasons for the delay

A significant portion of the delay in this case occurred when appellate defense counsel took nearly 16 months to file an assignment of errors. However, we recognize that the defense's motions for enlargement generally cited caseload as the reason for the delay, and "responsibility for this portion of the delay and the burden placed upon appellate defense counsel initially rests with the Government," because the Government provides staffing to the appellate defense division. *Moreno*, 63 M.J. at 137. The appellant retained civilian counsel long after the case had been joined, and therefore the fact that his military appellate defense counsel took an extended period to file a brief in this case should not be held against him.

After the Government timely filed an answer and the case was joined, one year passed before this Court issued its order for oral argument. We find that no valid reason exists for this delay.

This Court initially scheduled oral argument for 11 September 2013. Oral argument was rescheduled for 15 November 2013 when the appellant retained civilian appellate defense counsel. We find that the appellant's retention of civilian defense counsel, and civilian defense counsel's other commitments justify the two-month delay in oral argument. Following oral argument, this Court has timely issued this decision.

We also note that this case involved a 24-volume record of trial with a trial transcript consisting of more than 1,500 pages. We find that the complexity of this case – which was caused in no small part by the appellant's misconduct – provides a partial explanation for the overall delay in this case.

Weighing the various portions of the overall appellate processing of this case, and considering the totality of the reasons discernable for this extended timeline, we find that this factor weighs slightly in favor of the appellant.

(3) The appellant's assertion of the right to timely review and appeal

At no time during the nearly three-year appellate processing of this case has the appellant expressed any concern with the time it has taken to review his case. To the contrary, the last three motions appellate defense counsel submitted for enlargement of

time to file an assignment of errors noted that the appellant concurred in his counsel's requests for delay. The appellant's motion to delay oral argument also noted his concurrence with the delay and documented that he waived this period for calculation of any issues of post-trial delay. We find that this factor weighs in favor of the Government.

(4) Prejudice

In *Barker*, the Supreme Court recognized a framework to analyze the prejudice factor in a speedy trial context, and the *Moreno* Court adopted this framework in analyzing claims of prejudice arising from post-trial delay. *Moreno*, 63 M.J. at 140. Under this framework, we are to analyze whether the following interests of the appellant have been prejudiced: (1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired.

Analyzing these sub-factors in the instant case, we find that there is some evidence that the post-trial delay in this case has prejudiced the appellant. The appellant was adjudged confinement for 12 months and a $75,000 fine, while our sentence reassessment finds that confinement for only three months and no fine is now appropriate. We recognize that even had this case been processed as quickly as possible, the size and complexity of this case makes it is extremely unlikely that this Court could have rendered a decision before the appellant's release from confinement. Nonetheless, the fact remains that the appellant served nine more months of adjudged confinement than he should have, and also has been deprived of the $75,000 he paid for his fine for an extended period.

We find no evidence that the appellant has suffered any particularized anxiety or concern that is distinguishable from the normal anxiety experienced by those awaiting an appellate decision. On the third prejudice sub-factor, because we have not authorized a sentence rehearing, there is no possibility that the appellant will have a negative impact on his ability to prepare and present his defense at a rehearing. Overall, we find that this fourth *Barker* factor weighs slightly in favor of the appellant.

We have analyzed the totality of the *Barker* factors, and we are mindful of our mandate to consider post-trial delay in approving only so much of the sentence as we determine is appropriate, *see United States v. Tardif*, 57 M.J. 219 (C.A.A.F. 2002). We elect to cure any prejudicial effects of the post-trial delay and render the appellant's sentence appropriate by approving only so much of the sentence as provides for a dismissal.

*Conclusion*

The finding of guilty as to Charge II and its Specification is set aside and dismissed on the grounds that this Court is unable to determine whether the court-martial possessed subject matter jurisdiction over the offenses of which the appellant was convicted. The finding of guilty as to the Additional Charge and its Specification is set aside and dismissed on the grounds of multiplicity. Concerning Charge I and its specifications, only those instances of forgery that occurred during the following dates, and for which the Government introduced sufficient evidence to demonstrate forgery, are affirmed: (1) 14 November 2005-14 March 2006, (2) 1 December 2006-30 March 2007, (3) 10-12 September 2007, (4) 1 October 2007-28 January 2008, (5) 11-15 February 2008, (6) 18-22 February 2008, (7) 25-26 February 2008, (8) 8-12 September 2008, (9) 15-19 September 2008, and (10) 22-26 September 2008. Therefore, we affirm only the following amended specifications under Charge I:

Specification 1: In that LIEUTENANT COLONEL STEVEN S. MORITA, United States Air Force, 60th Medical Support Squadron, Travis Air Force Base, California, did, inside or outside the United States, on divers occasions between on or about 1 August 2006 and on or about 1 October 2008, with intent to defraud, falsely make the signature and initials of Lieutenant Colonel [KP] to the following:

| Document Type | Travel Order Number | Date | Number of Signatures/Sets of Initials Per Documents |
|---|---|---|---|
| AF Form 40A | N/A | 26 Sep 08 | 2/0 |
| AF Form 40A | N/A | 19 Sep 08 | 2/0 |
| AF Form 40A | N/A | 12 Sep 08 | 2/0 |
| AF IMT 40A | N/A | 26 Feb 08 | 2/0 |
| AF IMT 40A | N/A | 22 Feb 08 | 2/0 |
| MFR | TV0145 | 20 Feb 08 | 1/0 |
| AF IMT 40A | N/A | 15 Feb 08 | 2/0 |
| MFR | TV0144 | 28 Dec 07 | 1/0 |
| MFR | TV0141 | 13 Dec 07 | 1/0 |
| AF IMT 973 | TV0140 | 12 Dec 07 | 2/1 |
| MFR | TV0139 | 9 Nov 07 | 1/0 |

which said signature and initials, would, if genuine, apparently operate to the legal harm of another.

Specification 2: In that LIEUTENANT COLONEL STEVEN S. MORITA, United States Air Force, 60th Medical Support Squadron, Travis Air Force Base, California, did, inside or outside the United States, on divers

occasions between on or about 1 November 2006 and on or about 1 March 2008, with intent to defraud, falsely make the signature and initials of Lieutenant Colonel [BK] to the following:

| Document Type | Travel Order Number | Date | Number of Signatures/Sets of Initials Per Documents |
|---|---|---|---|
| DD Form 1351 | TV0145 | 20 Feb 08 | 2/1 |
| DD Form 1610 | TV0144 | 20 Jan 08 | 2/2 |
| DD Form 1351 | TV0144 | 28 Dec 07 | 2/1 |
| DD Form 1351 | TV0141 | 13 Dec 07 | 2/2 |
| DD Form 1351 | TV0142 | 13 Dec 07 | 2/1 |
| DD Form 1610 | TV0144 | 12 Dec 07 | 2/2 |
| DD Form 1610 | TV0141 | 20 Nov 07 | 2/2 |
| DD Form 1351 | TV0140 | 19 Nov 07 | 2/2 |
| DD Form 1610 | TV0142 | 15 Nov 07 | 2/2 |
| DD Form 1351 | TV0139 | 9 Nov 07 | 2/1 |
| DD Form 1351 | TV0140 | 1 Nov 07 | 2/2 |
| DD Form 1610 | TV0139 | 21 Oct 07 | 2/2 |
| DD Form 1351 | TV0001 | 9 Oct 07 | 2/2 |
| DD Form 1351 | TV0004 | 9 Feb 07 | 2/1 |
| DD Form 1610 | TV0004 | 2 Feb 07 | 2/2 |
| DD Form 1610 | TV0003 | 7 Dec 06 | 2/1 |
| DD Form 1351 | TV0002 | 1 Dec 06 | 2/1 |

which said signature and initials, would, if genuine, apparently operate to the legal harm of another.

Specification 3: In that LIEUTENANT COLONEL STEVEN S. MORITA, United States Air Force, 60th Medical Support Squadron, Travis Air Force Base, California, did, inside or outside the United States, on divers occasions between on or about 1 November 2005 and on or about 1 July 2007, with intent to defraud, falsely make the signature and initials of Major [ME] to the following:

| Document Type | Travel Order Number | Date | Number of Signatures/Sets of Initials Per Documents |
|---|---|---|---|
| DD Form 1351 | TV0115 | 26 Mar 07 | 2/1 |
| DD Form 1610 | TV0116 | 20 Mar 07 | 2/2 |
| DD Form 1610 | TV0115 | 20 Mar 07 | 2/2 |
| DD Form 1351 | TV0108 | 12 Mar 07 | 2/1 |
| DD Form 1351 | TV0107 | 8 Mar 07 | 2/1 |
| DD Form 1610 | TV0108 | 2 Mar 07 | 2/2 |

| | | | |
|---|---|---|---|
| DD Form 1610 | TV0107 | 23 Feb 07 | 2/2 |
| DD Form 1351 | TV0104 | 14 Dec 06 | 2/1 |
| DD Form 1351 | TV0103 | 14 Dec 06 | 2/1 |
| DD Form 1610 | TV0104 | 10 Dec 06 | 2/1 |
| DD Form 1351 | TV0102 | 8 Dec 06 | 2/1 |
| DD Form 1351 | TV0101 | 8 Dec 06 | 2/1 |
| DD Form 1351 | TV0047 | 31 Jan 06 | 2/1 |
| DD Form 1351 | TV0036 | 22 Dec 05 | 2/1 |
| DD Form 1351 | TV0020 | 15 Nov 05 | 2/1 |

which said signature and initials, would, if genuine, apparently operate to the legal harm of another.

Specification 4:  In that LIEUTENANT COLONEL STEVEN S. MORITA, United States Air Force, 60th Medical Support Squadron, Travis Air Force Base, California, did, inside or outside the United States, on divers occasions between on or about 1 January 2007 and on or about 10 February 2007, with intent to defraud, falsely make the signature and initials of Lieutenant Colonel [JC] to the following:

| Document Type | Travel Order Number | Date | Number of Signatures/Sets of Initials Per Documents |
|---|---|---|---|
| DD Form 1351 | TV0111 | 9 Feb 07 | 2/1 |
| DD Form 1351 | TV0007 | 25 Jan 07 | 2/1 |
| DD Form 1610 | TV0007 | 19 Jan 07 | 2/2 |
| DD Form 1351 | TV0006 | 19 Jan 07 | 2/1 |
| DD Form 1610 | TV0006 | 8 Jan 07 | 2/2 |
| DD Form 1610 | TV0111 | 4 Jan 07 | 2/2 |

which said signature and initials, would, if genuine, apparently operate to the legal harm of another.

Specification 5 is set aside and dismissed because neither of the charged instances of forgery took place while the record reveals the appellant was in Article 2(a), UCMJ, status.

Specification 6 [renumbered Specification 5 after this Court's set aside and dismissal of Specification 5]:  In that LIEUTENANT COLONEL STEVEN S. MORITA, United States Air Force, 60th Medical Support Squadron, Travis Air Force Base, California, did, inside or outside the United States, on divers occasions between on or about 1 November 2005 and on or about

1 March 2008, with intent to defraud, falsely make the signature and initials of [JM] to the following:

| Document Type | Travel Order Number | Date | Number of Signatures/Sets of Initials Per Documents |
|---|---|---|---|
| DD Form 1610 | TV0116 | 20 Mar 07 | 1/0 |
| DD Form 1610 | TV0115 | 20 Mar 07 | 1/0 |
| DD Form 1610 | TV0108 | 2 Mar 07 | 1/0 |
| DD Form 1610 | TV0107 | 23 Feb 07 | 1/0 |
| DD Form 1610 | TV0004 | 2 Feb 07 | 1/0 |
| DD Form 1610 | TV0007 | 19 Jan 07 | 1/0 |
| DD Form 1610 | TV0006 | 8 Jan 07 | 1/0 |
| DD Form 1610 | TV0111 | 4 Jan 07 | 1/0 |
| DD Form 1610 | TV0104 | 10 Dec 06 | 1/0 |

which said signature and initials, would, if genuine, apparently operate to the legal harm of another.

Specification 7 [to be renumbered as Specification 6 after this Court's dismissal of original Specification 5] is set aside and dismissed because none of the charged instances of forgery took place while the record reveals the appellant was in Article 2(a), UCMJ, status.

As so modified, the findings are correct in law and fact. The Court approves only so much of the sentence as provides for a dismissal. The findings, as modified, and the sentence, as reassessed and modified, are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c); *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000). Accordingly, the findings, as modified, and the sentence, as reassessed and modified, are

AFFIRMED.

FOR THE COURT

LAQUITTA J. SMITH
Appellate Paralegal Specialist