# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

## UNITED STATES

### v.

### Staff Sergeant BENJAMIN A. FELDKAMP
### United States Air Force

### ACM 38493

### 1 May 2015

Sentence adjudged 29 June 2013 by GCM convened at Whiteman Air Force Base, Missouri. Military Judge: J. Wesley Moore.

Approved Sentence: Dishonorable discharge, confinement for 4 years, forfeiture of all pay and allowances, and reduction to E-1.

Appellate Counsel for the Appellant: Captain Lauren A. Shure.

Appellate Counsel for the United States: Major Daniel J. Breen; Captain Thomas J. Alford; and Gerald R. Bruce, Esquire.

Before

MITCHELL, WEBER, and CONTOVEROS
Appellate Military Judges

OPINION OF THE COURT

This opinion is issued as an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.

WEBER, Judge:

A general court-martial comprised of officer and enlisted members convicted the appellant, contrary to his pleas, of one specification each of sexual assault, abusive sexual contact, and indecent conduct, in violation of Articles 120 and 134, UCMJ, 10 U.S.C. §§ 920, 934.[1] The adjudged and approved sentence consisted of a

---

[1] The charged act for the sexual assault specification occurred after 28 June 2012, meaning the appellant was charged with violating the current version of Article 120, UCMJ, 10 U.S.C. § 920. The charged act for the abusive sexual contact specification took place in March 2012, meaning the appellant was charged with violating the version of Article 120, UCMJ, in effect from October 2007 to June 2012. The indecent conduct specification was not a

dishonorable discharge, confinement for 4 years, forfeiture of all pay and allowances, and reduction to the grade of E-1.

The appellant raises seven assignments of error before this court: (1) Article 120(b)(2), UCMJ, violated his right to equal protection under the law, (2) the military judge erred by not issuing a mistake of fact instruction for the sexual assault specification, (3) the sexual assault specification should be dismissed as constitutionally void for vagueness and overbroad as applied, (4) the military judge erred by not issuing a voluntary intoxication instruction for the sexual assault, (5) the military judge erred by ruling that the indecent conduct charge was not preempted by another UCMJ provision, (6) the military judge erred when he found the indecent conduct charge and the sexual assault specification were not multiplicious with the sexual assault specification, and (7) the military judge erred by denying the defense motion in limine concerning testimony by the government's DNA expert. We find no error materially prejudicial to a substantial right of the appellant and affirm.

*Background*

The appellant and Staff Sergeant (SSgt) JT worked in the same duty section at Whiteman Air Force Base (AFB) and experienced an "on again, off again" dating relationship for some time leading up to early 2012. By March 2012, the two were in an "off" period of their dating relationship but lived in the same house along with a third Air Force member. One day that month, the appellant and SSgt JT attended a bull riding competition in Kansas City, Missouri, along with a third Airman. The group rented a hotel room in Kansas City knowing they would be consuming alcohol. After the competition and stops for food and alcohol, the appellant and SSgt JT returned to the hotel room while the third Airman remained behind. The two ate their food and fell asleep together in the hotel room's sole bed. At some point before the appellant and SSgt JT fell asleep, the third Airman entered the room and promptly fell asleep without observing anything of note.

In the morning, SSgt JT woke to find her nightgown pulled up and the appellant's mouth on her breast. SSgt JT saw the appellant smile as he looked at her face; she pulled the covers over herself and turned away. When she thought the appellant had fallen asleep, she dressed and left the room. She returned a short time later and the group gathered their belongings and checked out of the hotel. As the group drove back to Whiteman AFB, SSgt JT confronted the appellant about his actions and told him never to do that to her again. She again confronted him after they returned home, telling him, "You can either tell me or you can tell [the Air Force Office of Special Investigations] what it is that you did to me." The appellant responded, "Whoa, whoa, whoa when you

specifically-listed offense under Article 134, UCMJ, 10 U.S.C. § 934, for this case. Indecent assault and indecent acts with another were formerly specifically-listed offenses under the UCMJ's General Article. However, these offenses were removed from Article 134, UCMJ, before the charged acts in this case.

woke up that's all – that's all I did." A short time later, SSgt JT made a restricted report of sexual assault and moved out of the house. However, within weeks she decided that she wanted to maintain a friendship with the appellant and the appellant's group of friends, so she continued to socialize with him. This socialization progressed to intimate conduct on at least one occasion after the March Kansas City incident but before July 2012. However, the two did not resume a dating relationship and remained in an "off" period. SSgt JT also had discussions about marrying another Airman who was stationed overseas.

On 19 July 2012, the appellant, SSgt JT, and one of the appellant's housemates made plans to meet at a local bar. After they consumed alcohol there, a friend picked up the group, brought the appellant's housemate home, and dropped off the appellant and SSgt JT at another bar. After consuming more alcohol there, the two walked to the appellant's home. The appellant, SSgt JT, and the appellant's other housemate sat on the couch for a short time until the housemate went to bed and the appellant and SSgt JT fell asleep.

SSgt JT then felt a sensation "like a penis going . . . in my vagina." She testified that she felt like she was experiencing a dream, and at some point she woke when she felt a tugging on her shorts. She perceived wetness between her legs and on her buttocks. She then "shot up" off the couch, pulled her underwear and shorts up, and asked the appellant what he did. The appellant replied, "I didn't do anything." SSgt JT went to the bathroom, smelled a strong scent of semen between her legs, and wiped herself off. When she emerged from the bathroom, the appellant again denied that he did anything and tried to stop SSgt JT from leaving. She responded by punching him in the face several times. SSgt JT left the house, called a co-worker to pick her up, and reported to a local hospital where a sexual assault examination was conducted. Subsequent forensic examination revealed spermatozoa on SSgt JT's buttocks and in her cervical pool. The spermatozoa contained DNA consistent with a sample taken from the appellant.

Local law enforcement and the Air Force Office of Special Investigations jointly interviewed the appellant after providing him with rights advisements. The appellant stated that he did not remember everything from that night due to his alcohol consumption, but that he remembered masturbating beside SSgt JT after he possibly "dry humped" her in order to wake her. The appellant admitted that SSgt JT was asleep when he engaged in this activity. He also stated that he remembered SSgt JT "waking up and freaking out." He admitted taking off his own shorts and at one point indicated SSgt JT's shorts were pulled down as well, though he denied pulling her shorts or underwear down. He also denied penetrating SSgt JT. The appellant also generally discussed his version of what occurred in the Kansas City hotel room in March 2012. Although questioning focused more on the July 2012 incident, the appellant did admit to engaging in intimate contact short of intercourse with SSgt JT the evening of the Kansas City incident.

Investigators also recovered text messages the appellant sent to SSgt JT after the July 2012 incident. In one message sent shortly after the incident, the appellant admitted to masturbating beside SSgt JT. He also stated he was a "drunk idiot" and that he deserved to be punched in the face more.

Further facts relevant to each assignment of error are discussed below.

*Issue I: Equal Protection*

The appellant first alleges that his conviction for violating Article 120(b)(2), UCMJ, (sexual assault) violates his right to equal protection under the law. He asserts that the appellant was as intoxicated as SSgt JT, if not more so, and the "only significant difference between the two is gender." He further reasons that there is "no apparent rational reason for the law to treat these two individuals differently," because if engaging in any sexual act with SSgt JT was a crime because of her intoxication, then it was also a crime for SSgt JT to engage in sexual acts with the appellant, who was also intoxicated. We reject this assignment of error.

We review issues of equal protection de novo. *United States v. Wright*, 53 M.J. 476, 478 (C.A.A.F. 2000).

Constitutional guarantees of equal protection are "generally designed to ensure that the Government treats 'similar persons in a similar manner.'" *United States v. Gray*, 51 M.J. 1, 22 (C.A.A.F. 1999) (quoting R. ROTUNDA AND J. NOWAK, TREATISE ON CONSTITUTIONAL LAW: SUBSTANCE AND PROCEDURE, 2d § 18.38 at 488; § 18:41 at 496 (1992)). Not every distinction among groups of people violates constitutional principles of equal protection, however. Instead:

> For the Government to make distinctions does not violate equal protection guarantees unless suspect classifications like race, religion, or national origin are utilized or unless there is an encroachment on fundamental constitutional rights like freedom of speech or peaceful assembly. The only requirement is that reasonable grounds exist for the classification used.

*United States v. Means*, 10 M.J. 162, 165 (C.M.A. 1981) (citations omitted). When evaluating an equal protection issue, "if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

An equal protection claim necessarily requires an appellant to demonstrate he is being treated differently than someone else who is similarly situated. This appellant has

not done so. The appellant seems to argue from the presumption that his case involves a mutual case of "drunken sex" in which both partners are equally intoxicated and participate equally in the sexual act. While his equal protection argument might raise an interesting issue in such a situation, the facts of his case are far different. The specification at issue alleged that the appellant penetrated SSgt JT while he knew or reasonably should have known that she was "asleep, unconscious, or otherwise unaware that the conduct was occurring." Through exceptions, the members found that the appellant knew or should have known that SSgt JT was asleep (not unconscious or unaware). Thus, the relative intoxication of the two parties was not at issue. Instead, the appellant committed a sexual act upon a sleeping victim who had no part in engaging in the charged sexual conduct. While SSgt JT was sleeping, the appellant remained awake as he penetrated SSgt JT without her consent and eventually ejaculated inside and upon her. Under these circumstances, it can hardly be said that the "only significant difference between the two is gender." The appellant has not shown how the sexual assault statute, applied to the facts of this case, treated him any differently than other service members in similar circumstances.

### Issues II and IV: Mistake of Fact as to Consent/Voluntary Intoxication Instructions

The appellant alleges the military judge erroneously failed to issue two instructions concerning defenses to the sexual assault specification: mistake of fact as to consent and voluntary intoxication. Regarding mistake of fact as to consent, the appellant asserts that evidence raised at trial indicated he might have believed that SSgt JT consented to the charged acts in July 2012. Regarding voluntary intoxication, he asserts that evidence of his alcohol consumption on the night of the July 2012 incident required an instruction that his voluntary intoxication could potentially negate his guilt. We disagree on both points.

Military judges have substantial discretionary power to decide which instructions to provide, but ultimately the question of whether a panel is properly instructed is a question of law reviewed de novo. *United States v. Ober*, 66 M.J. 393, 405 (C.A.A.F. 2008); *United States v. Dearing*, 63 M.J. 478, 482 (C.A.A.F. 2006); *United States v. Gurney*, 73 M.J. 587, 598 (A.F. Ct. Crim. App. 2014). A military judge must instruct panel members on any affirmative defense that is "in issue." Rule for Courts-Martial (R.C.M.) 920(e)(3); *United States v. Stanley*, 71 M.J. 60, 61 (C.A.A.F. 2012). A matter is considered "in issue" when "some evidence, without regard to its source or credibility, has been admitted upon which members might rely if they chose." *Id.* at 61 (quoting *United States v. Lewis*, 65 M.J. 85, 87 (C.A.A.F. 2007)) (internal quotation marks omitted). "Any doubt whether an instruction should be given 'should be resolved in favor of the accused.'" *United States v. Brown*, 43 M.J. 187, 189 (C.A.A.F. 1995) (quoting *United States v. Steinruck*, 11 M.J. 322, 324 (C.M.A. 1981)).

We first address mistake of fact as to consent. R.C.M. 916(j)(1) provides that "it is a defense to an offense that the accused held, as a result of ignorance or mistake, an incorrect belief of the true circumstances such that, if the circumstances were as the accused believed them, the accused would not be guilty of the offense."

As findings instructions were being discussed, the military judge asked trial defense counsel if they believed mistake of fact as to consent had been raised by the evidence as a defense to any of the specifications. Trial defense counsel asserted that they believed the defense had been raised with respect to all specifications. Trial counsel opposed this, asserting that the evidence did not indicate any mistake of fact as to consent on the part of the appellant, let alone a reasonably held mistake.

The military judge ruled he would issue the mistake of fact as to consent instruction regarding the March 2012 charged abusive sexual contact, as some evidence existed that the appellant and SSgt JT had previously fallen asleep together and engaged in a practice of waking each other up in order to engage in sex. However, as to the July 2012 charged sexual assault and indecent conduct, the military judge declined to issue the instruction, ruling:

> The Court does not believe that there . . . has been some evidence presented that would warrant the mistake of fact as to consent defense for the specifications involving 19 July 2012. The circumstances surrounding that, their interactions prior to the night are different. The Court does not believe that the circumstances are the same in their relationship and the Court would also note that this was after the incident on 31 March 2012, where it is clear that some amount of displeasure was expressed from all the evidence . . . . So I'm not going to instruct on mistake of fact as to consent as to that.

Trial defense counsel then further asserted that the consensual intimate activity that took place between the appellant and SSgt JT between the charged March and July 2012 incidents provided a further basis for issuing the mistake of fact as to consent instruction. The military judge replied that he was aware of this evidence, but this did not change his ruling:

> The Court does not believe that that in and of itself gets us to mistake of fact as to consent on the couch that particular night, based on their interactions at the bar and before that. Sitting next to somebody on the couch and falling asleep is -- is different than, and in this Court's opinion, versus the events that happened on the 31st of March.

We find the military judge did not err in declining to issue a mistake of fact as to consent instruction as to the charged July 2012 sexual assault. We assume for the purposes of our analysis that mistake of fact as to consent may be an allowable instruction for a charge of sexual assault,[2] and that that sexual assault is a specific intent crime requiring only a subjective mistake of fact in the appellant's mind rather than a mistake that is both subjectively held and objectively reasonable.[3] Even making these assumptions, the military judge did not err in declining to provide the instruction. As the military judge noted, the July 2012 incident did not occur in a vacuum. It came just months after the Kansas City incident, where SSgt JT woke to the appellant's mouth on her exposed breast. SSgt JT's reaction to this incident—including moving out of the house, confronting the appellant in front of other people, threatening to report him to investigators, and developing a relationship with another man—leaves the appellant little room to argue he believed SSgt JT consented to the July 2012 activity. In addition, as the military judge noted, the July 2012 incident was different in significant ways from the March 2012 incident. In the July 2012 incident, the appellant and SSgt JT were not in bed together and had engaged in no amorous activity that evening. SSgt JT testified that she did not kiss the appellant, initiate any romantic contact, or indicate any intention to the appellant that she was interested in sexual activity that night. No evidence was introduced to contradict this testimony. The fact that she consented to intimate activity with the appellant at some point about three weeks before the July 2012 incident does not change the equation, particularly since she was not asleep when that consensual activity occurred. The fact remains that by the night in question, the appellant had no reason to believe that SSgt JT consented to sexual activity while she lay asleep on the couch. The military judge did not err by not providing this instruction.

---

[2] As we have noted, "[t]he history of the mistake of fact defense relative to offenses under Article 120, UCMJ, is complicated." *United States v. Waddell*, ACM 38500, unpub. op at 6 (A.F. Ct. Crim. App. 11 February 2015). "This history, plus the creation of Article 120(b)(3), UCMJ, criminalizing sexual conduct with unaware or impaired victims, has led some commentators to question whether or when mistake of fact as to consent is an affirmative defense for that offense." *Id.*

[3] For specific intent crimes a mistake of fact need only to have existed in the mind of the accused, while general intent crimes require that the mistake of fact was both subjectively held and objectively reasonable. Rule for Courts-Martial 916(j)(1); *United States v. DiPaola*, 67 M.J. 98, 102 (C.A.A.F. 2008). While no court has definitively taken a position as to the offense of sexual assault under the current version of Article 120, UCMJ, a reasonable argument can be made that sexual assault under the current version of Article 120, UCMJ, is a general intent crime because it does not require proof of a particular specific intent. *Cf. United States v. Hibbard*, 58 M.J. 71, 72 (C.A.A.F. 2003) (holding rape by force under a prior version of Article 120, UCMJ, was a general intent crime). When the parties discussed the issue of the mistake of fact instruction in this trial, they also agreed sexual assault was a general intent offense. If sexual assault is considered to be a general intent offense, a mistake of fact as to consent instruction would not be required unless some evidence was introduced to show not only that the appellant held this mistake of fact, but that the mistake of fact was objectively reasonable. *See United States v. Gurney*, 73 M.J. 587, 598–99 (A.F. Ct. Crim. App. 2014) (holding that mistake of fact as to consent instruction was not required for charge of maltreatment because no evidence was presented that the appellant's belief was objectively reasonable).

We next address the military judge's decision not to issue a voluntary intoxication instruction. Trial defense counsel asked the military judge to instruct the members concerning the defense of voluntary intoxication in regard to the sexual assault specification. Trial defense counsel initially opined that the offense represented a specific intent element requiring proof that the appellant intended to abuse, humiliate, harass, degrade, or to arouse or gratify the sexual desires of any person. Based on this, combined with evidence that the appellant was consuming alcohol leading up to the July 2012 incident, trial defense counsel asserted that "more than some evidence" was presented regarding the appellant's intoxication. After further questioning by the military judge, trial defense counsel expanded his request for the instruction to be issued regarding the abusive sexual contact specification arising from the March 2012 incident as well.

Discussion between the military judge and trial counsel then revealed that the sexual assault statute did not contain a specific intent element, as trial defense counsel had initially represented. Once the military judge realized the sexual assault statute did not contain such an element, he ruled that he would not give the voluntary intoxication instruction. Trial counsel then conceded that the instruction was appropriate for the abusive sexual contact specification resulting from the March 2012 incident, and the military judge instructed the members accordingly. The appellant now alleges that the military judge erred in not providing the voluntary intoxication instruction with respect to the sexual assault specification. We disagree.

R.C.M. 916(l)(2) provides as follows:

> Voluntary intoxication, whether caused by alcohol or drugs, is not a defense. However, evidence of any degree of voluntary intoxication may be introduced for the purpose of raising a reasonable doubt as to the existence of actual knowledge, specific intent, willfulness, or a premeditated design to kill, if actual knowledge, specific intent, willfulness, or premeditated design to kill is an element of the offense.

We assume again—only for purposes of this analysis—that sexual assault is a specific intent offense requiring only a subjective mistake of fact in the appellant's mind rather than a mistake that is both subjectively held and objectively reasonable. We further assume that the appellant's intoxication required a voluntary intoxication instruction under the facts of this case. Even with these assumptions, the appellant was not prejudiced by any error. Failure to provide a required instruction is constitutional error reviewed to determine whether that error was harmless beyond a reasonable doubt. *United States v. McDonald*, 57 M.J. 18, 20 (C.A.A.F. 2002) (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). The relevant question is whether it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the

error?" *Neder v. United States*, 527 U.S. 1, 18 (1999). The government bears the burden of showing a constitutional error is harmless beyond a reasonable doubt, and must demonstrate that "no reasonable possibility" exists that the error "contributed to the contested findings of guilty." *United States v. Othuru*, 65 M.J. 375, 377 (C.A.A.F. 2007). Applying this standard, we find beyond a reasonable doubt that the members' findings would not have changed had the mistake of fact as to consent and/or voluntary intoxication instruction been provided. Regardless of the appellant's state of mind, the evidence clearly revealed that SSgt JT was asleep during the charged sexual assault, and that the appellant knew or should have known she was asleep. Additionally, mistake of fact and voluntary intoxication instructions were provided for the abusive sexual contact specification involving the March 2012 incident. Despite the fact that there was some evidence supporting a mistake of fact as to consent for the March 2012 incident, the members nonetheless convicted him of this offense. We therefore see no reasonable possibility that the members would have acquitted the appellant of either specification involving the July 2012 incident had these instructions been provided.

*Issue III: Void for Vagueness*

The appellant next alleges that Article 120(b)(2), UCMJ, criminalizing sexual assault, is unconstitutionally vague because the appellant "has no way of knowing what the proscribed conduct is in his circumstances." He asserts that the statute does not appear to contain any mens rea requirement, but that this court may "read one in" to avoid interpreting the statute as creating a strict liability offense. He contends that the statute is unconstitutionally vague in two ways: (1) it lacks fair notice because on its face, it is unclear as to what intent is required with regard to the sexual contact itself; and (2) it encourages arbitrary enforcement because it lacks a requirement that the sexual contact be done with the specific intent to abuse, degrade, humiliate, or arouse the sexual desires of any person. Relatedly, he contends that the statute is overbroad because it potentially criminalizes liberty interests protected under *Lawrence v. Texas*, 539 U.S. 558 (2003). The crux of all these arguments is that the statute could criminalize the unintentional touching of a penis to a vagina.[4] We disagree with these assertions.

We review the constitutionality of a statute de novo. *United States v. Disney*, 62 M.J. 46, 48 (C.A.A.F. 2005).

The Due Process Clause of the Fifth Amendment[5] "requires 'fair notice' that an act is forbidden and subject to criminal sanction" before a person can be prosecuted for committing that act. *United States v. Vaughan*, 58 M.J. 29, 31 (C.A.A.F. 2003) (quoting *United States v. Bivins*, 49 M.J. 328, 330 (C.A.A.F. 1998)). Due process "also

---

[4] Trial defense counsel filed a motion to dismiss based on void-for-vagueness grounds. However, that motion was focused on the indecent conduct charge and specification, not the sexual assault specification. The argument presented in trial defense counsel's motion is not relevant to the discussion of the issue raised on appeal.

[5] U.S. CONST. amend. V.

requires fair notice as to the standard applicable to the forbidden conduct." *Id.* (citing *Parker v. Levy*, 417 U.S. 733, 755 (1974)). In other words, "[v]oid for vagueness simply means that criminal responsibility should not attach where one could not reasonably understand that his contemplated conduct is proscribed." *Parker*, 417 U.S. at 757 (citing *United States v. Harriss*, 347 U.S. 612, 617 (1954)). In short, a void for vagueness challenge requires inquiry into whether a reasonable person in the appellant's position would have known that the conduct at issue was criminal. *See, e.g., Vaughan*, 58 M.J. at 31 (upholding a conviction under the General Article for leaving a 47-day-old child alone on divers occasions for as long as six hours; while the Article did not specifically list child neglect as an offense, the appellant "should have reasonably contemplated that her conduct was subject to criminal sanction, and not simply the moral condemnation that accompanies bad parenting"); *United States v. Sullivan*, 42 M.J. 360, 366 (C.A.A.F. 1995) ("In our view, any reasonable officer would know that asking strangers of the opposite sex intimate questions about their sexual activities, using a false name and a bogus publishing company as a cover, is service-discrediting conduct under Article 134," UCMJ).

In addition, due process requires that criminal statutes be defined "in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). This "more important aspect of vagueness doctrine" requires that the statute "'establish minimal guidelines to govern law enforcement'" rather than "'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Id.* at 358 (quoting *Smith v. Goguen*, 415 U.S. 566, 574–75 (1974)).

The relevant provision of Article 120(b)(2), UCMJ, makes it a crime to "commit[] a sexual act upon another person when the person knows or reasonably should know that the other person is asleep, unconscious, or otherwise unaware that the sexual act is occurring." A "sexual act" is defined, in relevant part, as "contact between the penis and the vulva . . . and for purposes of this subparagraph contact involving the penis occurs upon penetration, however slight." Article 120(g)(1), UCMJ.

We find that Article 120(b)(2), UCMJ, is not void for vagueness, and the appellant was on reasonable notice that his conduct was proscribed. The record does not support the appellant's contention that his conduct in penetrating SSgt JT was unintentional. Instead, the appellant pulled down SSgt JT's shorts and underwear and penetrated her to the point where he deposited some of his sperm in her cervical pool. He did this while he knew or reasonably should have known that SSgt JT was asleep. Around this same time, he masturbated to the point where he ejaculated on her. When investigators confronted him with SSgt JT's allegations, he did not allege that he might have penetrated her inadvertently. Instead, he denied penetrating her altogether. Under these circumstances, the appellant simply cannot argue that his conduct might have been unintentional. Therefore, his argument that the statute might cover unintentional penetration has no

bearing on this case. Likewise, we reject the appellant's contention that the statute infringes upon constitutionally-protected interests recognized in *Lawrence*. *Lawrence* recognized that sexual conduct is protected where "two adults, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle." *Lawrence*, 539 U.S. at 578. "Nonconsensual sexual activity is simply not protected under *Lawrence*," and a sexual act "with a sleeping victim does not implicate constitutional protections or even arguably constitute permissible behavior." *United States v. Whitaker*, 72 M.J. 292, 293 (C.A.A.F. 2013). Therefore, there is no possibility that the statute, as applied to the appellant's conduct, infringed upon constitutionally-protected interests.

*Issue V: Preemption*

The appellant alleges that the military judge erred by ruling that the indecent conduct charge and specification were not preempted by Articles 120 and 128, UCMJ. The appellant alleges that Congress intended to limit prosecution of indecent acts to only the offenses delineated in Articles 120 (covering various sexual offenses) and 128 (covering assault), UCMJ. He asserts that when Congress replaced the specifically-listed offense of indecent acts under Article 134, UCMJ, with a more expanded version of Article 120, UCMJ, Congress intended to preempt use of Article 134, UCMJ, to charge this type of offense. The defense raised this issue at trial, and the military judge found the Article 134, UCMJ, offense was not preempted. We find no error in the military judge's ruling.

We review claims of preemption de novo. *United States v. Jones*, 66 M.J. 704, 706 (A.F. Ct. Crim. App. 2008).

The preemption doctrine generally prohibits application of Article 134, UCMJ, to conduct covered by Articles 80 through 132, UCMJ, in certain situations. As typically applied, the doctrine states "that where Congress has occupied the field of a given type of misconduct by addressing it in one of the specific punitive articles of the code, another offense may not be created and punished under Article 134, UCMJ, by simply deleting a vital element." *United States v. Kick*, 7 M.J. 82, 85 (C.M.A. 1979). However, preemption does not automatically apply just because the act charged under Article 134, UCMJ, contains a subset of the elements of the enumerated offense. Rather, the preemption doctrine only precludes prosecution under Article 134, UCMJ, where two elements are met:

> (1) "Congress intended to limit prosecution for . . . a particular area" of misconduct "to offenses defined in specific articles of the Code," and (2) "the offense charged is composed of a residuum of elements of a specific offense."

*United States v. Curry*, 35 M.J. 359, 360–61 (C.M.A. 1992) (quoting *United States v. McGuinness*, 35 M.J. 149, 151–52 (C.M.A. 1992)); *see also United States v. Wright*, 5 M.J. 106 (C.M.A. 1978).

The continued viability of the preemption doctrine has been called into question in recent years because our superior court has recently stressed that Article 134, UCMJ, contains a distinct criminal element not inherently included in the enumerated offenses of Articles 80 through 132, UCMJ. Therefore, it remains to be seen what continuing viability the preemption doctrine has. *See United States v. Jones*, 68 M.J. 465, 474 n.2 (Baker, J., dissenting) ("[T]he majority has also eliminated the issue of multiplicity and claims of preemption for clauses 1 and 2 of Article 134, UCMJ . . . ."). However, our superior court has not expressly stated that the preemption doctrine no longer applies or that it now applies differently in light of case law developments concerning Article 134, UCMJ. We therefore presume for purposes of this opinion that the preemption doctrine still applies as it traditionally has.

At trial, the defense moved to dismiss the Article 134, UCMJ, indecent conduct charge and specification, arguing that the government was prohibited under the preemption doctrine from charging this conduct under the General Article. Trial defense counsel noted that the Department of Defense had proposed including a specifically-listed indecent conduct offense under Article 134, UCMJ, but the President did not adopt this proposed amendment. Trial defense counsel also observed that before 1 October 2007, crimes involving indecent acts were charged under a specifically-listed provision in Article 134, UCMJ, but the 2007 Amendment to the Manual for Courts-Martial consolidated several sexual misconduct offenses and replaced the Article 134, UCMJ, offense of indecent acts with an indecent act provision in Article 120, UCMJ. When Article 120, UCMJ, was further amended in 2012, it did not include a separate indecent conduct or indecent acts offense. Therefore, trial defense counsel asserted, Congress intended for Article 120, UCMJ, to cover all sexual offenses in the military, and Congress specifically intended not to create an Article 134, UCMJ, offense of indecent acts or indecent conduct.[6] Alternatively, trial defense counsel asserted, the indecent conduct charged in this case is preempted by Article 128, UCMJ, assault consummated by a battery.

The military judge denied the defense's preemption motion. The military judge thoroughly analyzed this issue, and his analysis is worth duplicating in full here:

> The defense argues that Article 120 and Article 128 preempt
> the Article 134 indecent conduct specification. Of note, the
> Article 134 specification does not attempt to criminalize

---

[6] Trial defense counsel noted that sodomy and forcible sodomy, Article 125, UCMJ, 10 U.S.C. § 925, offenses are not covered by Article 120, UCMJ, but asserted that Article 125, UCMJ, "remains the exception to the rule [and] there is movement toward bringing the offense of sodomy and forcible sodomy into Article 120's fold."

conduct of a traditional common law offense by removing an element, such as the intent element. Here, the specification adds an indecency element. Indecency is only an element in the current Article 120[b] and 120c when describing indecent conduct with a child, indecent language with a child, and indecent exposure. Indecent language with an adult remains an Article 134 offense. The specification is also not an Article 128 assault consummated by a battery offense with an element missing. As above, indecency is still a new element. A second new element, asleep, unconscious or otherwise unaware[,] is also new. Further, the defense has failed to present sufficient evidence that Congress intended Article 128, Article 120, or any other Article in the UCMJ from Article 80 to 132 to cover indecent conduct under these circumstances. The defense does not cite to detailed legislative history that this type of behavior may not be charged under Article 134. The defense cites to two portions of a [Joint Service Committee (JSC)] Subcommittee report. This report mentions preemption and consolidation of all nonconsensual sex crimes in Article 120, but it [is] far from detailed legislative history. The report's comments should be kept in context with four factors: 1) Article 125 remains a nonconsensual sex crime outside of Article 120; 2) Congress has twice revised Article 120 in the last seven years; 3) A JSC Subcommittee Report cannot substitute for legislative history; and 4) a more recent JSC action in 2012 publish[ed] in the Federal Register the proposed Indecent Conduct offense on which this specification is based. The fact that the President's last Executive Order did not include approval of the indecent conduct offense does not mean that such action is dead. Of note, no Executive Order to establish Part IV of the MCM for Article 120 has been approved to date and the maximum punishments for Article 120 were approved by Executive Order well after implementation of the new Article 120.

We find no error with the military judge's ruling that the preemption doctrine did not prohibit the government from charging the appellant's indecent conduct under Article 134, UCMJ. We need not even reach the issue of Congress's intent, because the Article 134, UCMJ, offense charged is not composed of a residuum of elements of a specific offense. The indecent conduct offense charged adds an element not required by any applicable Article 120, UCMJ, or Article 128, UCMJ, offense—that the appellant's conduct was indecent. The military judge instructed the members that to convict the appellant of this offense, they had to find the appellant's actions were indecent, and he

defined that term as relating to "sexual impurity which is grossly vulgar, obscene, and repugnant to common propriety, and tends to excite sexual desire or deprave morals with respect to sexual relations." In addition, the Article 134, UCMJ, offense required proof that the appellant's conduct was service discrediting and prejudicial to good order and discipline, an element not contained in any Article 120 or 128, UCMJ, offense. Therefore, this is not a situation where the government created and punished another offense by simply deleting a vital element.

Our decision is consistent with a somewhat related holding in *United States v. Quick*, 74 M.J. 517, 522–23 (N.M. Ct. Crim. App. 2014), where the Navy-Marine Corps Court of Criminal Appeals held that "the appellant has not demonstrated that the 2012 Congressional amendment to Article 120, UCMJ, preempted the use of Article 134, UCMJ, to criminalize indecent conduct that is prejudicial to good order and discipline or as conduct of a nature to bring discredit upon the armed forces." In *Quick*, the appellant alleged that his conviction for indecent conduct by engaging in a video-recorded group sex encounter was preempted by Article 120c, UCMJ. The appellant asserted that once Congress enacted Article 120c, UCMJ, (covering various sexual misconduct including indecent viewing, visual recording, or broadcasting), indecent conduct was no longer an offense because it is not listed as a specific offense under the 2012 version of the UCMJ, and thus, "Congress did not intend to criminalize private, consensual group sex under the 2012 UCMJ." *Id.* at 522. The court rejected this argument, finding "Article 120c was only 'intended to criminalize non-consensual sexual misconduct that ordinarily subjects an accused to sex offender registration.'" *Id.* (quoting *Manual for Courts-Martial, United States* (2012 ed.), App. 23 at A23-16). While not directly on point, *Quick* supports the general proposition that Congress did not necessarily intend for all instances of sexual misconduct such as indecent conduct to be subsumed within Article 120, UCMJ.[7]

---

[7] On a related note, our decision today does not conflict with our order in the interlocutory appeal of *United States v. Long*, Misc. Dkt. No. 2014-02 (A.F. Ct. Crim. App. 2 July 2014) (order). In *Long*, we held that the military judge did not err in determining that the offenses alleged in four Article 134, UCMJ, specifications were preempted by Article 120b, UCMJ, because the elements of the Article 134, UCMJ, offenses were no different than a charged offense for violating Article 120b, UCMJ, and Congress intended Article 120b, UCMJ, to be a comprehensive statute to address sexual misconduct with children. In *Long*, the concern was that the government used the General Article to enlarge the age range of the enumerated offense of Article 120b, UCMJ. Our holding was based on the concern that the "charged specification involves 'the dropping of an element of a specifically denounced offense' and converting it to a broader age range." *Id.* at 8–9 (quoting *United States v. Herndon*, 36 C.M.R. 8, 11 (C.M.A. 1965)). No such concern is present in the instant case. The government did not charge the appellant with indecent conduct under Article 134, UCMJ, to broaden an existing enumerated offense; rather, it charged the appellant with an act under Article 134, UCMJ, that is not an offense at all under the enumerated articles, and in so doing, took upon itself the burden of proving additional elements not contained within any offense under Article 120, UCMJ, or Article 128, UCMJ.

*Issue VI: Multiplicity*

At trial, defense counsel moved to dismiss the indecent conduct charge arising from the July 2012 incident as multiplicious and an unreasonable multiplication of charges. Trial defense counsel asserted that the sexual assault specification subsumed the indecent conduct charge and covered the same conduct as the indecent conduct charge because they involved the same act. In other words, the defense asserted, the indecent conduct (ejaculating on SSgt JT) "was the end result of the act" charged as sexual assault. Trial defense counsel argued that, if the two separate charges and specifications were allowed to stand, the government could separately charge any ejaculation that results from a sexual assault.

We review issues of multiplicity de novo. *United States v. Anderson*, 68 M.J. 378, 385 (C.A.A.F. 2010). A military judge's decision to deny relief for unreasonable multiplication of charges is reviewed for an abuse of discretion. *United States v. Campbell*, 71 M.J. 19, 22 (C.A.A.F. 2012) (citing *United States v. Pauling*, 60 M.J. 91, 95 (C.A.A.F. 2004)).

Multiplicity in violation of the Double Jeopardy Clause of the Constitution occurs when "'a court, contrary to the intent of Congress, imposes multiple convictions and punishments under different statutes for the same act or course of conduct.'" *Anderson*, 68 M.J. at 385 (quoting *United States v. Roderick*, 62 M.J. 425, 431 (C.A.A.F. 2006)) (emphasis omitted). Accordingly, an accused may not be convicted and punished for two offenses where one is necessarily included in the other, absent congressional intent to permit separate punishments. *See United States v. Teters*, 37 M.J. 370, 376 (C.M.A. 1993); *United States v. Morita*, 73 M.J. 548, 564 (A.F. Ct. Crim. App. 2014). The Supreme Court laid out a "separate elements test" for analyzing multiplicity issues: "The applicable rule is that, where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). Accordingly, multiple convictions and punishments are permitted if the two charges each have at least one separate statutory element from each other. *Morita*, 73 M.J. at 564. Where one offense is necessarily included in the other under the separate elements test, legislative intent to permit separate punishments may be expressed in the statute or its legislative history, or "it can also be presumed or inferred based on the elements of the violated statutes and their relationship to each other." *Teters*, 37 M.J. at 376–77.

Even if charged offenses are not multiplicious, courts may apply the doctrine of unreasonable multiplication of charges to dismiss certain charges and specifications. R.C.M. 307(c)(4) summarizes this principle as follows: "What is substantially one transaction should not be made the basis for an unreasonable multiplication of charges against one person." The principle provides that the government may not needlessly

"pile on" charges against an accused. *United States v. Foster*, 40 M.J. 140, 144 n.4 (C.M.A. 1994). Our superior court has endorsed the following non-exhaustive list of factors to consider in determining whether unreasonable multiplication of charges has occurred:

(1) Did the [appellant] object at trial that there was an unreasonable multiplication of charges and/or specifications?

(2) Is each charge and specification of charges and specifications aimed at distinctly separate criminal acts?

(3) Does the number of charges and specifications misrepresent or exaggerate the appellant's criminality?

(4) Does the number of charges and specifications [unreasonably] increase the appellant's punitive exposure?

(5) Is there any evidence of prosecutorial overreaching or abuse in the drafting of the charges?

*United States v. Quiroz*, 55 M.J. 334, 338–39 (C.A.A.F. 2001) (citation and internal quotation marks omitted). Unlike multiplicity, where an offense found multiplicious for findings is necessarily multiplicious for sentencing, the concept of unreasonable multiplication of charges may apply differently to findings than to sentencing. *Campbell*, 71 M.J. at 23. In a case where the *Quiroz* factors indicate unreasonable multiplication of charges principles affect sentencing more than findings, "the nature of the harm requires a remedy that focuses more appropriately on punishment than on findings." *Quiroz*, 55 M.J. at 339.

The military judge denied the motion to dismiss, finding the charging decisions in this case did not constitute multiplicity or an unreasonable multiplication of charges, at least regarding the findings portion of the case. The military judge first found the two specifications were not multiplicious because the elements of the two offenses are different. Regarding unreasonable multiplication of charges, the military judge analyzed the relevant factors and concluded, "The Court does not find the government is piling on charges, but is instead trying to capture the full set of allegations for presentation to the fact finder." However, the military judge merged the two offenses for sentencing.

We conclude, as did the military judge, that the sexual assault and indecent conduct charges and specifications are not multiplicious. The sexual assault specification required proof that the appellant penetrated, however slightly, SSgt JT's vulva with his penis while she was asleep. The indecent conduct required proof that the appellant ejaculated on SSgt JT while she was asleep, and that such conduct was prejudicial to

good order and discipline and of a nature to bring discredit upon the armed forces. The only element the two offenses share, after the members' exceptions, is that SSgt JT was asleep during the sexual acts. Sexual assault required proof of penetration that indecent conduct did not, and indecent conduct required proof of ejaculation plus the General Article's terminal element, items not required to prove sexual assault. One offense is not necessarily included in the other, and therefore no multiplicity concern is present.

We also find the military judge did not abuse his discretion in finding that unreasonable multiplication of charges concerns affected sentencing only. Applying the *Quiroz* factors, the military judge found:

> 1) The appellant objected at trial;
>
> 2) Each offense is based on separate criminal acts, because the members could reasonably have found the appellant guilty of just one of the two charged acts and the appellant admitted to one charged act while denying the other. The charging scheme attempted to allow flexibility for the members depending on their assessment of the witnesses' credibility and the strength of the evidence;
>
> 3) The inclusion of both charges does not misrepresent or exaggerate the appellant's criminality, but instead captures two separate wrongdoings. Even though the two events may have occurred close in time, each could occur completely independently of the other;
>
> 4) The appellant's punitive exposure would increase by the two convictions, but not unfairly so; and
>
> 5) The government did not attempt to "pile on" charges but rather tried to capture the full set of allegations to present to the members.

The military judge, writing after trial, then concluded the following:

> In this case, the members found the Accused guilty of both charges. The Court considered the remedy of dismissing the Additional Charge and Specification [indecent conduct]. The Court determined such action was inappropriate in the interests of justice. The evidence supporting the Additional Charge and Specification was stronger based on the admissions of the Accused. The trial included a significant

number of motions properly preserving numerous appellate issues. Additionally, the collateral consequences to the Accused of the conviction for sexual assault are far greater than the indecent conduct specification. Dismissal of the indecent conduct specification is an unnecessary remedy at the trial level considering the interests of justice.

However, orally at trial and in his later written ruling, the military judge did find the two charges and specifications represented an unreasonable multiplication of charges when it came to sentencing. The military judge found that without merging the two offenses for sentencing, the appellant might unfairly "face an increased potential sentence even though these two events were close in time."

The military judge's resolution of this issue involved no error of law and was thorough and rational. We therefore find no abuse of discretion in his ruling. We note, as did the military judge, that it was entirely possible for the appellant to have committed one offense but not the other, and in fact, he essentially admitted to having committed one offense but denied committing the other. The two charges were aimed at separate wrongs that were separated by some unknown amount of time. In fact, drafting two charges resulting from the July 2012 incident is consistent with the appellant's account to investigators, in which he stated that he possibly "dry humped" her in order to wake her for sex, and it was only when that failed that he masturbated next to her and ejaculated on her. The defense presented no evidence of prosecutorial overreaching or abuse in drafting the charges this way, and with the merger of the two offenses for sentencing, the appellant did not unfairly face any increased punitive exposure. This issue provides no grounds for further relief by the appellant.[8]

*Issue VII: DNA Expert Testimony*

After the sexual assault examination gathered evidence from SSgt JT and investigators took a sample of the appellant's DNA from him, the evidence was sent to a forensics laboratory for DNA analysis. A forensic biologist received the evidence and conducted serology and DNA analysis on the items. His report concluded that the semen

---

[8] Though not specifically raised by the appellant, we considered whether dismissing one specification was appropriate under *United States v. Elespuru*, 73 M.J. 326 (C.A.A.F. 2014). In *Elespuru*, our superior court held that the appellant waived his claim that specifications for abusive sexual contact and wrongful sexual contact were multiplicious. However, the court nonetheless held that "[t]he Government charged and tried the abusive sexual contact and wrongful sexual contact offenses in the alternative for exigencies of proof, but nonetheless argues on appeal that both convictions should stand. While the Government's charging strategy was appropriate, we disagree that both convictions may stand." *Id.* at 329. This is not the type of situation covered by *Elespuru*. While the record of trial contains some discussion indicating that the charging decisions in this case could be seen as an attempt to charge the appellant in the alternative, the government never explicitly made this representation at trial and the record overall indicates that the charging scheme was intended to convey that the prosecution believed the appellant committed both of these separate acts.

DNA profile obtained through extraction of evidence taken from SSgt JT matched the appellant's DNA profile. At trial, the government attempted to call this biologist as an expert witness to testify as to his findings; however, the biologist experienced a medical issue and was unable to appear. Therefore, the government called a substitute expert, Dr. Timothy Kalafut. Dr. Kalafut was another forensic biologist at the same laboratory and had served as the technical reviewer of the original biologist's testing.

Trial defense counsel objected to Dr. Kalafut's testimony as testimonial hearsay in violation of the Confrontation Clause.[9] After hearing from Dr. Kalafut, the military judge noted that the government did not intend to present the original biologist's report into evidence or use it in any way. Instead, the military judge found, "the government intend[ed] to call Dr. Kalafut as a witness to explain his role as technical reviewer in the DNA testing and provide his independent expert opinion under [Mil. R. Evid.] 703 of the results." The military judge issued, in relevant part, the following findings of fact:

> Dr. Kalafut served as the technical reviewer of the DNA testing in this case. Every USACIL report is peer reviewed by another qualified examiner. Dr. Kalafut was such a qualified examiner. He reviewed the case file in its entirety and agreed with its overall conclusions. This process attempts to rework the case from scratch by following the paper trail prepared by the original examiner. Dr. Kalafut doesn't even read the report until he completely does his own analysis. Dr. Kalafut initialed the technical review that the case was finished and complete. He agreed with the findings and the report was issued by [the original biologist]. This decision to certify the results was an exercise of his independent judgment.
>
> . . .
>
> Dr. Kalafut's trial testimony is being drawn from the review of the computer generated data that is data typically relied upon by forensic biologists to draw conclusions. Dr. Kalafut will identify samples as vaginal swab, cervical swab, and external skin swab solely based on the label that is embedded in the electronic data file. The name on each of the labels is written during collection of the sample. USACIL examiners simply use the label that was on the original sealed envelope. They rely entirely on whoever put that swab into that box in

---

[9] U.S. CONST. amend. VI.

that specific way and labeled it in that manner to identify where it came from, on whoever's body.

Appellate defense counsel does not challenge these findings of fact, and we adopt them as our own.

The military judge then noted one possible issue caused by Dr. Kalafut's testimony. He observed that the original biologist would have input the label names into the computer system, and Dr. Kalafut later relied on this data in the computer system to reach his ultimate conclusion that the DNA profile of evidence obtained from SSgt JT matched the appellant's DNA profile. However, he found that this matter did not present a concern of testimonial hearsay for the following reasons:

> Dr. Kalafut testified that he can sometimes tell if an error is made in labeling. Additionally, the origin of the terms on the labels is from those who initially collected the samples. In this case, the [Air Force Office of Special Investigations] agent and [the nurse who conducted the sexual assault examination] are available and subject to cross-examination. Similarly, as Dr. Kalafut acted as technical reviewer, he too can be cross-examined about the data on which he relied. While some may argue that [the original biologist] is the right witness from cross-examination as he did the labeling, the Court believes that this labeling qualifies as non-testimonial for several reasons. First, it is a routine cataloguing of the labels that others in the process affixed to the samples. Second, at this phase in the testing, [the original biologist] had no idea whether the DNA profiles would result in a match or not. While he knew he was assisting . . . in a criminal investigation against a particular individual, he was not at the point where he would know that entering data was the production of evidence with an eye toward trial. Finally, entering simple data labels in a computer system have no indicia of solemnity and bear no resemblance to formalized testimonial materials. Instead, these data labels are similar to internal chain-of-custody and internal review documents in urinalysis testing that are used to maintain internal control, not to create evidence for use at a later trial.

The military judge therefore denied the defense motion to exclude Dr. Kalafut's testimony. He ruled that Dr. Kalafut could "testify to his independent opinions as long as he does not repeat inadmissible testimonial hearsay." He then placed several limits on Dr. Kalafut's testimony to ensure the witness did not cross over into repeating testimonial

hearsay. These limits were: (1) Dr. Kalafut was prohibited from repeating any testimonial hearsay of the process specifically used by the initial biologist, or repeating comments in the original biologist's notes or report in giving Dr. Kalafut's opinion; (2) Dr. Kalafut could testify to the process he conducted as a technical reviewer and could tell the members which parts of the testing he did not do personally, and he could tell the members in "very general terms" the categories of things he relies on as an expert without repeating the substance of any of those things; and (3) Dr. Kalafut could testify to his own independent conclusions but could not repeat the underlying findings of the serology results or DNA profile unless he was relying on machine generated data or he conducted the actual testing himself.

During Dr. Kalafut's testimony, the military judge took a very active role to ensure his ruling was being followed. He stopped trial counsel and Dr. Kalafut a number of times to remind the members that Dr. Kalafut did not perform the initial DNA testing and to provide limiting instructions. Trial counsel and Dr. Kalafut also went to great lengths to stress Dr. Kalafut's role in this process. Appellate defense counsel concedes that "through the majority of Dr. Kalafut's testimony he did an excellent job of limiting himself to only discussing machine-generated data and not testifying to conclusions." However, the appellant alleges that Dr. Kalafut introduced testimonial hearsay when he stated that the samples taken from SSgt JT contain DNA consistent with the appellant. The appellant alleges that in so testifying, Dr. Kalafut was simply repeating the original biologist's conclusions.

We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Clayton*, 67 M.J. 283, 286 (C.A.A.F. 2009). Under the abuse of discretion standard, we review the military judge's findings of fact under the clearly erroneous standard and his or her conclusions of law de novo. *Id.* The legal question of whether admitted evidence constitutes testimonial hearsay in violation of the Confrontation Clause is a question of law we review de novo. *United States v. Blazier*, 68 M.J. 439, 442 (C.A.A.F. 2010).

The Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him. In *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004), the Supreme Court held that concern with testimonial hearsay is the "primary object" of the Sixth Amendment, and that testimonial hearsay may not be admitted unless the absent witness is unavailable and a prior opportunity for cross-examination was afforded. The Court, however, did not adopt a precise definition of "testimonial hearsay."

Since then, case law attempting to apply the principle of testimonial hearsay has not followed a clear path. Our resolution of this issue renders it unnecessary to detail the development of the testimonial hearsay principle; that history is laid out in our decision in *United States v. Katso*, 73 M.J. 630 (A.F. Ct. Crim. App. 2014). In *Katso*, we held that

an appellant's confrontation right was violated when a substitute DNA analyst was permitted to testify in place of the analyst who actually conducted the DNA testing. We found:

> [A]s a matter of fact the record of trial does not definitively establish that [the substitute expert] had first-hand knowledge as to whom the known DNA sample or its corresponding profile belonged. He was able to identify the appellant by name only by repeating the testimonial statement contained in [the original analyst's] report that directly linked the appellant to the generated DNA profile. Without this connection, [the substitute expert] could testify that in his expert opinion the two DNA profiles [the original analyst] created by purifying, quantifying, and copying the DNA found in the swabs he analyzed matched one another in certain respects, but consistent with the Confrontation Clause, [the substitute expert] could not identify the appellant by name.

*Id.* at 638–39.

The appellant complains of the same error in this case that we found in *Katso*: that the substitute expert was only able to identify that the known DNA came from the appellant by repeating testimonial hearsay. However, the record here is much better developed than that in *Katso*, and supports the conclusion that Dr. Kalafut did not rely on testimonial hearsay in his testimony. The military judge specifically found that Dr. Kalafut was able to identify the source of the known DNA extraction by relying on his own review of machine-generated data and simple computer system entries based solely on labeling conducted by law enforcement investigators and the sexual assault nurse examiner. Dr. Kalafut specifically testified in motions practice that he conducted his own review of the DNA analysis in this case and came to his own independent opinion that the male DNA extracted from SSgt JT was consistent with the appellant's DNA. He came to this conclusion before he ever looked at the report generated by the original forensic biologist. As the military judge found, any connection Dr. Kalafut made between the male DNA taken from SSgt JT and the appellant's DNA profile was based solely on chain of custody documents and machine-generated data. Such items typically do not qualify as testimonial in nature. *United States v. Tearman*, 72 M.J. 54, 61 (C.A.A.F. 2013). We therefore see this case as presenting a significantly different situation from that in *Katso*, and we doubt *Katso* controls the outcome here.

However, we need not definitively decide this issue, because even assuming the appellant's confrontation right was violated, any such error was harmless beyond a reasonable doubt. We review this issue de novo. *United States v. Kreutzer*, 61 M.J. 293, 299 (C.A.A.F. 2005). Even if an accused's constitutional right to confrontation is

violated, the findings and sentence may be upheld if the error was harmless beyond a reasonable doubt. *Tearman*, 72 M.J. at 62. To determine whether a Confrontation Clause error is harmless beyond a reasonable doubt, we examine factors such as: (1) the importance of the unconfronted testimony, (2) whether that testimony was cumulative, (3) the existence of corroborating evidence, (4) the extent of confrontation permitted, and (5) the strength of the prosecution's case. *United States v. Sweeney*, 70 M.J. 296, 306 (C.A.A.F. 2011).

Having examined these factors and the entire record of trial, we are convinced beyond a reasonable doubt that any error in admitting this one portion of Dr. Kalafut's testimony was harmless. Dr. Kalafut's one answer the appellant now objects to was only provided in re-direct examination, where he merely responded to a question about the possibility of sample contamination during shipping. More importantly, the facts of this case raised no real question about the source of the semen. The appellant admitted to ejaculating on SSgt JT, and the defense did not allege that another person was the source of the semen found in SSgt JT's cervical pool. Rather, the question at trial was whether the appellant's semen from SSgt JT's skin was somehow transferred to SSgt JT's cervical pool through contamination, either as she wiped herself off or when the sexual assault examination was conducted. Dr. Kalafut's primary contribution to the prosecution's case was to identify that semen was found in samples taken from SSgt JT and to discount the possibility of contamination. Therefore, any connection Dr. Kalafut made between the semen samples taken from SSgt JT and the appellant's DNA was unimportant to the prosecution's case and cumulative with the appellant's own admissions that he ejaculated on her. Based on this, and the overall strength of the government's case, we are confident beyond a reasonable doubt that any error in admitting this one portion of Dr. Kalafut's testimony was harmless.

## *Conclusion*

The approved findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of the appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the approved findings and the sentence are

AFFIRMED.

FOR THE COURT

LEAH M. CALAHAN
Deputy Clerk of the Court

23                                                                                    ACM 38493